DEL LAGO PARTNERS, INC. and Del Lago Partners, L.P., Doing Business Under the Assumed Name of Del Lago Golf Resort & Conference Center, and BMC–The Benchmark Management Company, Petitioners,

v.

Bradley SMITH, Respondent.

No. 06–1022.

Supreme Court of Texas.

Argued Dec. 6, 2007.

Decided April 2, 2010.

Audrey Mullert Vicknair, Law Office of Audrey Mullert Vicknair, Corpus Christi, TX, Lansford O. Ireson Jr., Ireson & Weizel, P.C., Mary Alice Parsons, Fulkerson, Feder & Wollam, L.L.P., Houston, TX, for Petitioners.

David Dies, Sandee Lee Hart, Steven Lowery Parkhurst, Dies & Hart, LLP, Orange, TX, for Respondent.

W. Wendell Hall, Fulbright & Jaworski L.L.P., San Antonio, TX, for Amicus Curiae Trammell Crow Central Texas, Ltd.

Leslie Patterson Moore, Irving, TX, for Amicus Curiae Mothers Against Drunk Driving.

Kathleen Cassidy Goodman, Law Office of Kathleen C. Goodman, PLLC, San Antonio, TX, for Amicus Curiae Pacific Legal Foundation.

Reagan W. Simpson, King & Spalding LLP, Austin, TX, for Amicus Curiae H.E.B. Grocery Company.

Justice WILLETT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice O'NEILL, Justice MEDINA, Justice GREEN, and Justice GUZMAN joined.

This appeal concerns a bar owner's liability for injuries caused when one patron assaulted another during a closing-time melee involving twenty to forty "very intoxicated" customers. The brawl erupted after ninety minutes of recurrent threats, cursing, and shoving by two rival groups of patrons. The jury heard nine days of conflicting evidence from twenty-one witnesses and found the owner fifty-one percent liable. The court of appeals affirmed the roughly $1.48 million award: "A reasonable person who knew or should have known of the one-and-a-half hours of ongoing 'heated' verbal altercations and shoving matches between intoxicated bar patrons would reasonably foresee the potential for assaultive conduct to occur and take action to make the condition of the premises reasonably safe."[1] We agree with the court of appeals and affirm its judgment.

## I. Background[2]

Bradley Smith was injured when a fight broke out among customers at the

---

1. 206 S.W.3d 146, 157–58.

2. Some of the evidence we recite is disputed, but "[i]t is the province of the jury to resolve conflicts in the evidence" and we must "as-

Grandstand Bar, part of the Del Lago resort on the shores of Lake Conroe.[3] The 300–acre resort consists of a conference center, hotel, golf course, marina, health spa and fitness center, and other facilities. The Grandstand Bar is located in the conference center.

Del Lago has a security force that includes two off-duty law enforcement officers—John Chancellor, the chief of the Shenandoah, Texas police department, and Lanny Moriarty, a lieutenant in the Montgomery County sheriff's department. Ruben Sanchez, a retired fireman and paramedic, was Del Lago's loss-prevention officer. At times up to six security personnel patrolled the resort. On the evening in issue, Chancellor and Moriarty were patrolling the resort in a golf cart. Sanchez was also on duty.

Smith attended a Sigma Chi fraternity reunion at Del Lago from Friday to Sunday, June 8–10, 2001. On Friday evening he stayed at the bar until it closed. Smith and fellow fraternity member Spencer Forsythe testified that a uniformed officer was on duty in the bar for several hours that evening. The officer removed an unruly and intoxicated fraternity member and made everyone leave the bar at midnight, an hour before the usual closing time.

On Saturday, fraternity members and guests attended a reception and dinner at the conference center. Del Lago provided a cash bar. Around 9:00 p.m., Smith and other fraternity members proceeded to the Grandstand Bar, which was very busy. As many as seven employees were working in the bar that evening. Later that evening, a group of ten to fifteen mostly male members of a wedding party entered the bar. Fraternity member Toby Morgan testified that soon after the wedding party arrived, there was tension in the air, tension that grew as the night went on. Forsythe testified that within ten to fifteen minutes of the wedding party's arrival, verbal confrontations between the wedding party and some of the forty remaining fraternity members began. These heated confrontations involved cursing, name-calling, and hand gestures.

Fraternity member Cesar Lopez testified that the animosity between the two groups arose when one of the fraternity members made an offensive comment to the date of one of the wedding-party members. The comment led to men squaring up to each other, with "veins popping out of people's foreheads." Del Lago waitress Elizabeth Sweet observed the exchanges, describing them as "talking ugly" and consisting of cursing, threats, and heated words. Sweet testified that the participants appeared drunk and that these confrontations recurred throughout a ninety-minute period. Morgan observed that the bar patrons were "very intoxicated" that night.

The verbal confrontations led to physical altercations. Forsythe testified that the first pushing and shoving match started after about ten minutes of yelling. Smith testified that he saw at least two physical incidents over the course of the evening. He saw a member of the wedding party

sume that jurors resolved all conflicts in accordance with [the] verdict." *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex.2005).

**3.** Smith sued Petitioners Del Lago Partners, Inc. and Del Lago Partners, L.P., doing business as Del Lago Golf Resort & Conference Center, and Petitioner BMC–The Benchmark Management Company (collectively "Del Lago"). The parties and the courts below have essentially treated Petitioners as a single entity that owned and operated the bar, and the parties do not quarrel with this treatment. The trial-court judgment was entered against all of these entities collectively.

square up chest to chest with a fraternity member, both pointing at each other and yelling and neither backing down. After three to five "very tense" minutes, the episode ended. Smith also saw a wedding-party member walk up to a group of fraternity members and push them from behind. The man cocked his arm back, but before anything further could happen other wedding-party members dragged him away.

Between 1:00 and 1:30 a.m., Forsythe saw some fraternity members and wedding-party members in each others' faces, and "things started getting really heated." The rest of the fraternity members walked over and saw that the confrontation was "getting to the serious point." Fifteen to twenty minutes before the final fight broke out, Smith heard yelling between the two groups.

Witnesses described more than one "pushing" match that evening. At least three witnesses described a particularly heated and intense shoving match that took place a few minutes before the ultimate fracas. The shoving match was followed by shouting and cursing.

Tensions finally came to a head when the bar staff attempted to close the bar. After the crowd refused to leave, the staff went table to table and formed a loose line to funnel the customers toward a single exit and into the conference center lobby. Smith testified that the staff was literally pushing the hostile parties out of the bar through the exit, prompting a free-for-all. He recalled that "it was just a madhouse," with punches, bottles, glasses, and chairs being thrown, and bodies "just surging." In Forsythe's words, "all heck broke loose" with pushing, shoving, kicking, and punching. He recalled that after the patrons had been "corralled" by the bar staff they were forced out of the bar:

I only remember one of the wait staff, and it was a female, and she was very close to the door, and she was very obnoxious, very belligerent, and saying, "Y'all get the 'F' out. All of y'all, get the 'F' out of here. Take the F-ing fight out of here. Get out." [And she] just pushed—matter of fact, one of our guys fell down, and she was pushing him while he was on the ground. "Just get the 'F' out. Get the 'F' out."

No one could give an exact number of fight participants, but estimates ranged from twenty to forty men, about equally divided between the wedding party and the fraternity.

Smith was standing against a wall observing the fight when he saw his friend Forsythe shoved to the floor. Smith knew Forsythe had a heart condition and waded into the scrum to remove him. By this time, the fight had moved into the lobby. Before Smith could extricate himself, an unknown person grabbed him and placed him in a headlock. Momentum carried Smith and his attacker into a wall, where Smith's face hit a stud. Smith suffered severe injuries including a skull fracture and brain damage.

Estimates of the fight's duration varied, but most testimony placed it between three and fifteen minutes. Waitress Sweet testified that "it wasn't a quick fight." The fight ended when a woman became caught up in it and was pushed to the ground.

After the fight began, Sweet went to the phone in the bar to call security. Next to the phone was a list of numbers, but none was for security. Sweet called the front desk to get the number. Instead of calling security, the front desk gave the number to Sweet. Instead of immediately calling the number given, Sweet passed it over to a bartender for him to make the call. Once the call was made, the two security

guards on duty, Officers Chancellor and Moriarty, responded swiftly, arriving within two to three minutes. Del Lago's loss-prevention officer, Sanchez, also responded and arrived within fifteen to twenty seconds of receiving the call. By the time he arrived, the fight was over.

Smith brought a premises-liability claim against Del Lago. After a nine-day trial involving twenty-one witnesses, the jury sifted through the conflicting evidence and found Del Lago and Smith both negligent, allocating fault at 51–49 percent in favor of Smith. The trial court reduced the jury's actual-damages award by forty-nine percent, and awarded Smith $1,478,283, together with interest and costs. A divided court of appeals affirmed.[4]

## II. Discussion

### A. Duty

■ Del Lago principally argues that it had no duty to protect Smith from being assaulted by another bar customer. In a premises-liability case, the plaintiff must establish a duty owed to the plaintiff, breach of the duty, and damages proximately caused by the breach.[5] Whether a duty exists is a question of law for the court and turns "on a legal analysis balancing a number of factors, including the risk, foreseeability, and likelihood of injury, and the consequences of placing the burden on the defendant."[6] In premises-liability cases, the scope of the duty turns on the plaintiff's status.[7] Here, Smith was an

invitee, and generally, a property owner owes invitees a duty to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition about which the property owner knew or should have known.[8]

We have not held that a bar proprietor always or routinely has a duty to protect patrons from other patrons, and do not so hold today. Nor have we held that a duty to protect the clientele necessarily arises when a patron becomes inebriated, or when words are exchanged between patrons that lead to a fight, and do not so hold today.

■ Generally, a premises owner has no duty to protect invitees from criminal acts by third parties.[9] We have recognized an exception when the owner knows or has reason to know of a risk of harm to invitees that is unreasonable and foreseeable.[10] In *Timberwalk Apartments, Partners, Inc. v. Cain,* we addressed the circumstances under which an apartment owner could be held liable for failing to prevent the sexual assault of a tenant. In addressing the element of foreseeability, we stated that

> courts should consider whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given the occurrences to indicate that

4. 206 S.W.3d at 164.

5. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005).

6. *Gen. Elec. Co. v. Moritz,* 257 S.W.3d 211, 217, 218 (Tex.2008).

7. *Urena,* 162 S.W.3d at 550.

8. *Id.; see also Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 753 (Tex. 1998) (holding that premises liability claim

was asserted when plaintiff claimed "defendants' failure to provide adequate security measures created an unreasonable risk of harm that defendants knew or should have known about and yet failed to correct").

9. *Timberwalk Apartments,* 972 S.W.2d at 756.

10. *Id.*

the landowner knew or should have known about them.[11]

*Timberwalk* recognized that "crime is increasingly random and violent and may possibly occur almost anywhere," and therefore rejected the imposition of a general duty to protect tenants "whenever crime might occur," since such a "duty would be universal."[12] *Timberwalk* provides a framework for analyzing how prior criminal conduct influences "what the premises owner knew or should have known" before the criminal act that injured the plaintiff.[13]

■ The *Timberwalk* factors—proximity, recency, frequency, similarity, and publicity—guide courts in situations where the premises owner has no direct knowledge that criminal conduct is imminent, but the owner may nevertheless have a duty to protect invitees because past criminal conduct made similar conduct in the future foreseeable. The *Timberwalk* factors are not the only reasons that a criminal act might be deemed foreseeable.[14] Although the court of appeals in this case considered prior criminal acts on the Del Lago premises in conducting an analysis of the *Tim-*

*berwalk* factors,[15] we find those factors inapplicable to today's case.

■ The nature and character of the premises can be a factor that makes criminal activity more foreseeable.[16] In this case, the fight occurred in a bar at closing time following ninety minutes of heated altercations among intoxicated patrons. As amicus curiae Mothers Against Drunk Driving notes, and as common sense dictates, intoxication is often associated with aggressive behavior.[17] According to the United States Department of Justice, alcohol use accompanies almost forty percent of all violent crimes.[18] Del Lago's security officer, Chancellor, agreed that threatening conversations are serious and that when intoxicated people start arguing, the "[n]ext thing you know," punches are thrown. He further testified that when faced with rowdy, verbally abusive people, he tries to separate them, and that in a bar atmosphere, removal of such patrons is warranted because, obviously, verbal confrontations "can escalate into a fight." That concern might have been the reason Del Lago removed a drunk patron from the bar the previous evening and closed the bar an hour early.

11. *Id.* at 757.

12. *Id.* at 756.

13. *Id.* at 757.

14. *Id.* at 759 (Spector, J., concurring) (stating that consideration of "other types of evidence" besides "similar incidents in the immediate vicinity" should be allowed in making foreseeability determination); *Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654, 665 (Tex.1999) (Baker, J., concurring) (stating that "the *Timberwalk* factors are not exclusive"); *id.* at 668 (O'Neill, J., dissenting) (seeing nothing in *Timberwalk* decision "to suggest that these factors are meant to be exclusive").

15. 206 S.W.3d at 154–55, 158–59.

16. *Mellon Mortgage*, 5 S.W.3d at 668 n. 2 (O'Neill, J., dissenting) (collecting authorities); *Timberwalk Apartments*, 972 S.W.2d at 759–60 (Spector, J., concurring).

17. Amicus curiae Pacific Legal Foundation similarly notes: "It cannot be denied that the consumption of alcohol increases the likelihood that people will exercise poor judgment, often leading to altercations."

18. Lawrence A. Greenfield, U.S. Dep't of Justice, Bureau of Justice Statistics, *Alcohol and Crime: An Analysis of National Data on the Prevalence of Alcohol Involvement in Crime*, at iii, *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/ac.pdf (last visited March 29, 2010).

■ More generally, criminal misconduct is sometimes foreseeable because of immediately preceding conduct. The Second Restatement of Torts explains that since the landowner "is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, *or are about to occur.*" [19] If "he should reasonably anticipate ... criminal conduct on the part of third persons, either generally *or at some particular time,* he may be under a duty to take precautions against it." [20] The Third Restatement of Torts clarifies further: "[I]n certain situations criminal misconduct is sufficiently foreseeable as to require a full negligence analysis of the actor's conduct. Moreover, the actor may have sufficient knowledge of the *immediate circumstances* ... to foresee that party's misconduct." [21] As we have recognized, when a property owner "by reason of location, mode of doing business, or observation or past experience, should reasonably anticipate criminal conduct on the part of third persons, ... [the owner] has a duty to take precautions against it." [22] This duty is recognized because "the party with the power of control or expulsion is in the best position to protect against the harm." [23]

In this case, Del Lago observed—but did nothing to reduce—an hour and a half of verbal and physical hostility in the bar. From the moment the wedding party entered, there was palpable and escalating tension. Del Lago continued to serve drunk rivals who were engaged in repeated and aggressive confrontations.

That a fight broke out was no surprise, according to the testimony of three fraternity members. According to Forsythe, everyone could tell serious trouble was brewing. Another fraternity member agreed that the fight was not unexpected but merely "a matter of time." A third characterized the situation as "very, very obvious"; if you did not see it you were "blind or deaf or [didn't] care."

■ We hold that Del Lago had a duty to protect Smith because Del Lago had actual and direct knowledge that a violent brawl was imminent between drunk, belligerent patrons and had ample time and means to defuse the situation. Del Lago's duty arose not because of prior similar criminal conduct but because it was aware of an unreasonable risk of harm at the bar that very night. When a landowner "has *actual* or constructive knowledge of any condition on the premises that poses an unreasonable risk of harm to invitees, he has a duty to take whatever action is reasonably prudent" to reduce or eliminate that risk. [24]

19. RESTATEMENT (SECOND) OF TORTS § 344 cmt. f (1965) (emphasis added).

20. *Id.* (emphasis added).

21. RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM § 19 cmt. f (2010) (emphasis added).

22. *Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 21 (Tex.1993) (quoting *Morris v. Barnette,* 553 S.W.2d 648, 650 (Tex.Civ.App.-Texarkana 1977, writ ref'd n.r.e.)); *see also Garner v. McGinty,* 771 S.W.2d 242, 246 (Tex.App.-Austin 1989, no writ) ("[W]e hold that a business invitor owes a duty to his business invitees to take reasonable steps to protect them from intentional injuries caused by third parties if he knows or has reason to know, from what he has observed or from past experience, that criminal acts are likely to occur, either generally or at some particular time.").

23. *Tidwell,* 867 S.W.2d at 21 (internal quotation marks omitted).

24. *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 295 (Tex.1983) (emphasis added).

JUSTICE WAINWRIGHT would hold that the risk of injury was not an *unreasonable* risk. He correctly notes that a property owner's duty to invitees extends only to reduce or eliminate an unreasonable risk of harm created by a premises condition.[25] Under the circumstances of this case, we think Smith faced an unreasonable risk of harm.

The unreasonableness of a risk cannot be completely separated from its foreseeability. It turns on the risk and likelihood of injury to the plaintiff, which for the reasons described above were substantial, as well as the magnitude and consequences of placing a duty on the defendant.[26] We do not see the burden of imposing a duty on Del Lago to take reasonable steps to protect patrons of the Grandstand Bar from potentially serious injury as unwarranted in these circumstances. Del Lago is a huge, multi-use facility covering hundreds of acres that provides entertainment and lodging to scores of guests daily. Like any similar facility, it recognized the need to provide private security throughout the resort. It did so through a trained security force.

We do not announce a general rule today. We hold only, on these facts, that during the ninety minutes of recurrent hostilities at the bar, a duty arose on Del Lago's part to use reasonable care to protect the invitees from imminent assaultive conduct. The duty arose because the likelihood and magnitude of the risk to patrons reached the level of an unreasonable risk of harm, the risk was apparent to the property owner, and the risk arose in circumstances where the property owner had readily available opportunities to reduce it.[27]

## B. Breach of Duty

Del Lago also contends that, assuming it had a duty to Smith, the evidence was legally insufficient on the essential elements of breach of duty and proximate causation. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."[28] We must view the evidence in the light most favorable to the verdict[29] and "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not."[30]

A reasonable and fair-minded jury could find that Del Lago breached its duty of care to Smith by failing to take reasonable steps to defuse the dangerous situation at the bar. Del Lago's duty was to "take whatever action [was] reasonably

25. *See W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex.2005).

26. *See Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990) ("In determining whether the defendant was under a duty, the court will consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant.").

27. *See Eastep v. Jack–in–the–Box, Inc.*, 546 S.W.2d 116, 118 (Tex.Civ.App.-Houston [14th

Dist.] 1977, writ ref'd n.r.e.) ("[A] long and continued course of conduct [is not required] to find that the proprietor had knowledge of the violent disposition of the other patron—all that is necessary is that there be a sequence of conduct sufficiently long to enable the proprietor to act for the patron's safety." (quoting *Coca v. Arceo*, 71 N.M. 186, 376 P.2d 970, 973 (1962))).

28. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

29. *Id.* at 822.

30. *Id.* at 827.

prudent under the circumstances to reduce or to eliminate the unreasonable risk from that condition."[31] We have alternatively described the duty as requiring the premises owner to "either adequately warn of the dangerous condition or make the condition reasonably safe."[32]

The jury could have found that Del Lago breached its duty because security failed to monitor and intervene during the extended period when the two groups in the bar were becoming more and more intoxicated and antagonistic. Officers Chancellor and Moriarty, the uniformed security personnel on duty that night, testified that they would usually go through the bar five to eight times a night, but they did not have specific recollections of going through the bar that particular evening. At the time of the fight, the bar was the only place at the resort serving alcohol, and the security office was aware that the bar was crowded, but no witness saw any security in the bar during the ninety minutes of yelling, threatening, cursing, and shoving between drunk patrons. Waitress Sweet specifically testified that she did not see security throughout the ninety minutes preceding the fight. The bar staff continued to serve drinks and did not call security until after the fight started. In contrast, security was on duty for hours in the bar the previous night and had ejected a drunk and unruly fraternity member.

There was legally sufficient evidence for the jury to conclude that Del Lago bar personnel were fully aware of the events transpiring in the bar and nevertheless unreasonably neglected to notify security. Forsythe testified that while the repeated confrontations were occurring, the wait staff and bartenders were watching and did nothing. Del Lago's security expert agreed at trial that he would "certainly" want the bar staff to call security after

**31.** *TXI Operations, L.P. v. Perry*, 278 S.W.3d 763, 764–65 (Tex.2009) (quoting *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 295 (Tex.1983)).

**32.** *Id.* at 765. JUSTICE JOHNSON's position, as we understand it, is that Del Lago cannot be liable unless *both* its failure to warn and its failure to make the premises safe independently caused Smith's injuries. We do not read Texas law as imposing such a universal requirement. We have recognized that owners must *adequately* warn or make safe, *id.*, and in some circumstances no warning can adequately substitute for taking reasonably prudent steps to make the premises safe. In today's case, a permanent sign warning bar patrons to "drink at your own risk," or a warning the night of the melee that a fight was imminent, hardly seems an adequate substitute for calling security or taking other reasonable steps during the course of the evening to prevent the fight. Further, as explained below, JUSTICE JOHNSON's view would revive the abandoned doctrine of voluntary assumption of the risk by completely barring recovery in cases where the premises condition was open and obvious, and where, therefore, a failure to warn could not have caused the injury.

Insofar as JUSTICE JOHNSON believes the jury charge required the jury to find that both a failure to warn and a failure to make the premises safe caused the injuries, Del Lago does not make this argument, and we do not so read the charge. The charge does not require separate proximate cause findings on failure to warn and failure to make safe to impose liability. It states that Del Lago's negligence could consist of the failure to use ordinary care "by both failing to adequately warn Bradley Smith of the condition and failing to make that condition reasonably safe." The jury could have and apparently did find that no warning would have been adequate under the circumstances, and that Del Lago was negligent in failing to use ordinary care to make the premises safe. Ordinary care as defined in the charge "means that degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances." The jury could have construed the charge to mean, and could have made the factual finding, that ordinary care under the circumstances required something other than a warning.

ninety minutes of serious verbal confrontations and at least one shoving match, if the staff did not feel the situation was under control. In his deposition, referred to at trial, he "absolutely" agreed that if his wife was in a bar that had experienced an hour and a half of verbal confrontations, he would want the bar staff to call security. Instead of calling security, asking patrons to leave, or otherwise bringing the situation under control, the bar staff continued to serve drinks.

The jury also could have found negligence on Del Lago's part by finding that bar personnel were not provided with the training and information needed to immediately notify security of an emergency; that the front desk failed to immediately notify security of the fight when the front desk was informed of the crisis, and instead gave the number for security back to a bar waitress to make the call; that the bar personnel should not have allowed the bar to stay open until 1:30 a.m.—a half-hour past the usual closing time—under the circumstances and should have asked unruly customers to leave earlier; and that Del Lago acted unreasonably in failing to provide a security presence at closing time instead of forcibly funneling the warring factions through a single exit.

■■■ JUSTICE JOHNSON would reverse because Smith was equally aware of the events transpiring at the bar and could have walked away, but instead chose to stay and enter the fray. The jury found Smith contributorily negligent, and Smith,

who says he entered the scrum to rescue a friend, does not argue otherwise here. JUSTICE JOHNSON's view would effectively revive the doctrine of voluntary assumption of the risk as a complete bar to recovery, but the Texas proportionate responsibility statute makes clear that a plaintiff's negligence bars recovery only "if his percentage of responsibility is greater than 50 percent." [33] Here, the jury found that Del Lago's negligence (fifty-one percent) exceeded Smith's (forty-nine percent). We abandoned the assumption-of-the-risk doctrine as a complete defense to tort liability thirty-five years ago,[34] holding that the Legislature's adoption of comparative negligence "evidenced its clear intention to apportion negligence rather than completely bar recovery." [35] A plaintiff's own risky conduct is now absorbed into the allocation of damages through comparative responsibility. We no longer compartmentalize negligence into rigid categories: "we have discarded categories like imminent-peril, last-clear-chance, and assumption-of-the-risk in favor of a general submission of comparative negligence." [36] A plaintiff's appreciation of and voluntary exposure to a dangerous on-premises risk is something the jury can weigh when apportioning responsibility, as was done in this case.

■■■ Further, we have expressly abolished a "no-duty" doctrine previously applicable to open and obvious dangers known to the invitee. Instead, a plaintiff's knowledge of a dangerous condition is relevant to determining his comparative neg-

---

**33.** TEX. CIV. PRAC. & REM.CODE § 33.001.

**34.** *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 758 (Tex.1975) (abolishing implied assumption of the risk but retaining affirmative defense of express assumption of the risk, when a plaintiff, before undertaking risky conduct, explicitly consents to take personal responsibility for potential injury-causing risks).

**35.** *Id.*

**36.** *Jackson v. Axelrad*, 221 S.W.3d 650, 654 (Tex.2007) (citing *French v. Grigsby*, 571 S.W.2d 867, 867 (Tex.1978) (disapproving of last-clear-chance doctrine); *Davila v. Sanders*, 557 S.W.2d 770, 771 (Tex.1977) (same regarding imminent peril); *Farley*, 529 S.W.2d at 758 (same regarding assumption of the risk)).

ligence but does not operate as a complete bar to recovery as a matter of law by relieving the defendant of its duty to reduce or eliminate the unreasonable risk of harm.[37] "A plaintiff's knowledge, whether it is derived from a warning or from the facts, even if the facts display the danger openly and obviously, is a matter that bears upon his own negligence; it should not affect the defendant's duty."[38] While presented in terms of a no-negligence or no-causation analysis, JUSTICE JOHNSON's view would in effect revive the no-duty rule rejected by statute and caselaw, and hold as a matter of law that an invitee's decision not to remove himself from a known and dangerous premises condition bars any recovery against the landowner.

JUSTICE HECHT's dissent posits a variant of JUSTICE JOHNSON's view. JUSTICE HECHT favors a rule drawn from section 343A(1) of the Second Restatement of Torts that

says landowners cannot be liable for dangerous conditions that are "known or obvious" (though he would permit liability for unavoidable risks). On this record, we cannot embrace a principle that embodies something akin to assumption of the risk. As comment (e) to section 343A explains, if the invitee "knows the actual conditions," the landowner "may reasonably assume that he will protect himself by the exercise of ordinary care, or that he will *voluntarily assume the risk* of harm if he does not succeed in doing so."[39]

The Second Restatement itself indicates that section 343A(1) is rooted in a doctrine that Texas, most other jurisdictions, and the Third Restatement of Torts have abandoned.[40] Professor Powers, Co-Reporter of the Third Restatement, explains that "[a]fter the advent of comparative responsibility ... most courts abandoned the

37. *Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 516–17 (Tex.1978). We recently distinguished *Parker* where the plaintiff was an employee of an independent contractor, but made clear that *Parker* remains the law applicable to invitees. *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 217 (Tex.2008).

38. *Parker*, 565 S.W.2d at 521.

39. RESTATEMENT (SECOND) OF TORTS § 343A cmt. e (1965) (emphasis added).

40. The Delaware Supreme Court has observed that "an overwhelming majority of courts" have recognized that sections 343 and 343A " 'are too heavily laden with the prohibited defenses of assumption of the risk and contributory negligence to be followed rigidly....' " *Koutoufaris v. Dick*, 604 A.2d 390, 396 (Del.1992) (quoting *Johnson v. A/S Ivarans Rederi*, 613 F.2d 334, 347 (1st Cir.1980)). Further, "[o]f those state courts which have addressed the issue of whether the principles espoused by § 343A survive the adoption of comparative negligence, only one appears to have answered in the affirmative." *Id.* Still further, "an even greater number of courts, while not addressing the precise issue pre-

sented here, have held that the rule articulated by § 343A does not limit a landowner's duty to latent dangers, but recognize that a landowner can be liable even for injuries resulting from obvious hazards thus posing a fact question for the jury," consistent with our holding today. *Id.* at 397.

JUSTICE HECHT advocated section 343A(1) in a recent dissent, *TXI Operations, L.P. v. Perry*, 278 S.W.3d 763, 771–72 n. 18 (Tex.2009) (Hecht, J., dissenting), but since the creation of Texas' comparative-negligence scheme, the Court has yet to adopt section 343A(1) as Texas law. Further, *TXI Operations*, as a procedural matter, turned solely on whether a premises owner gave an adequate warning. The dissent in that case contended that the warning was adequate to meet the landowner's duty as a matter of law. *Id.* at 769–70. Today's case poses a separate question, whether "in some circumstances no warning can adequately substitute for taking reasonably prudent steps to make the premises safe." 307 S.W.3d at 771 n. 32. The issue here—whether a landowner is always absolved of all liability if the invitee knows about the dangerous condition—is different from the narrower issue presented in *TXI Operations*.

doctrine," [41] and "[i]n light of these developments, the new Restatement rejects all forms of implied assumption of risk." [42]

More to the point, JUSTICE HECHT's reliance on section 343A(1) gives short shrift to the section's last twelve words, which anticipate today's uncommon facts. Though section 343A(1) bars liability when an invitee is aware of the dangerous condition, that absolution comes with an exception: "unless the possessor should anticipate the harm despite such knowledge or obviousness." That is, if Del Lago had reason to expect harm notwithstanding Smith's awareness of the risk, it may still be liable. That caveat seems to capture today's narrow and fact-specific holding. We do not hold today that a landowner can never avoid liability as a matter of law in cases of open and obvious dangers. We merely hold that Smith's refusal to walk away does not completely bar recovery, given the jury's decision to apportion liability, and given Del Lago's actual and direct knowledge that a violent brawl was brewing notwithstanding Smith's awareness of the surroundings. In some circumstances, no warning can suffice as reasonably prudent action to reduce or remove an unreasonable risk. Indeed, the reason Del Lago "should anticipate the harm despite such knowledge or obviousness" is because Del Lago's own conduct that night did nothing to decrease the danger and much to promote it.

Ultimately, JUSTICE HECHT makes a compelling argument that Smith was negligent. We agree. So do Smith, Del Lago, JUSTICE JOHNSON, the court of appeals, the trial court, and the jury. Our only disagreement is whether Smith's negligence is a complete bar to recovery. On this record, it is not.

## C.   Causation

The evidence of proximate cause was also legally sufficient. There may be more than one proximate cause of an event, [43] and indeed the jury found that both Del Lago and Smith contributed to Smith's injury. Proximate cause comprises two elements: cause in fact and foreseeability. [44] The ninety minutes of alcohol-fueled verbal and physical exchanges between the two groups in the bar, directly observed by Del Lago personnel, provide the element of foreseeability, as discussed above. "The 'foreseeability' analysis is the same for both duty and proximate cause." [45]

As to causation in fact, generally the test for this element is whether the defendant's act or omission was a substantial factor in causing the injury and without which the injury would not have occurred. [46] The jury could have found, on the lay and expert testimony presented, that a security presence and response in the bar at some point during the ninety minutes that the two antagonistic groups were confronting each other would have defused the situation and prevented the violent brawl at closing time. Security could have removed particularly unruly patrons prior to the fight. The jury heard evidence that the mere presence of uniformed security personnel can defuse barroom tensions. Bartender Arlene Duncan,

**41.** William Powers, Jr., *Sports, Assumption of Risk, and the New Restatement*, 38 WASHBURN L.J. 771, 772 (1999).

**42.** *Id.* at 775.

**43.** *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex.2001).

**44.** *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex.2005).

**45.** *Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654, 659 (Tex.1999) (plurality opinion).

**46.** *Urena*, 162 S.W.3d at 551.

for example, testified that uniformed officers can usually deter problems in the bar. She also believed that any failure of staff to report serious confrontations at the bar not only was a violation of Del Lago policy, but put "people in a situation that easily could've been avoided." Officer Chancellor testified that a uniformed presence can chill dangerous or criminal activity. He agreed that his ability to defuse hostile behavior might explain why he had never witnessed a physical fight at Del Lago. Smith's security expert, Gerald Brandt, testified that Del Lago employees had ample opportunity to notify security of the hostile situation in the bar and that a security presence would have prevented the fight and Smith's injuries.

The jury also could have reasonably determined that Del Lago's bar and front-desk personnel moved too slowly to notify security after the fight broke out, and that this delay was a proximate cause of Smith's injuries. Although the evidence was conflicting as to the length of the fight, the jury heard evidence that security arrived in a matter of seconds after being notified.

In concluding that the evidence of causation was legally insufficient, JUSTICE JOHN-SON relies on *East Texas Theatres, Inc. v. Rutledge.*[47] In that case, we held that the causation evidence was legally insufficient where a movie theater patron was injured by a bottle thrown by another patron. We held the evidence insufficient to establish that removing unruly patrons or a security presence would have prevented the incident. The Court noted that efforts to remove "rowdy persons" might not have succeeded in removing the unknown bottle thrower.[48] *Rutledge* is factually distinguishable. The combatants in today's case were not sitting in a hushed and darkened theater but in a raucous and lighted bar; security could have identified them more easily and removed them. Today's case is further distinguishable: (1) the melee was preceded by ninety minutes of repeated belligerence between obviously intoxicated patrons; (2) expert testimony was offered that a security presence could have prevented the fight; (3) one of Del Lago's bartenders testified that the situation that night "easily could've been avoided;" (4) a Del Lago security officer likewise opined that his mere presence could defuse hostile behavior; and (5) on the previous night a rowdy customer had been removed from the bar and the bar had closed early, with the result that no confrontations occurred. Legally sufficient evidence of causation was presented on this record.

### D. *Premises Liability v. Negligent Activity*

JUSTICE WAINWRIGHT would reverse because the case should have been submitted to the jury under a negligent-activity theory. For several reasons, we disagree.

As to landowners, we have recognized negligent-activity and premises-liability theories of liability.[49] Smith believed both theories were applicable to his case, but Del Lago objected to the submission of a negligent-activity theory. The trial court agreed and only submitted a premises-liability question. Del Lago cannot now obtain a reversal on grounds that the jury should have decided the facts under a theory of liability that Del Lago itself persuaded the trial court not to submit to the jury.[50]

---

47.   453 S.W.2d 466 (Tex.1970).

48.   *Id.* at 469.

49.   *E.g., Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 753 (Tex.1998).

50.   *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000) (citing TEX.R. CIV. P. 272, 274, 278, 279).

Even if Del Lago had preserved this ground for reversal in the trial court, neither Del Lago's petition nor briefs to us mention it, and we should not stretch for a reason to reverse that was not raised.[51] This ground for reversal was waived.

Ignoring preservation of error problems, the case was properly submitted on a premises-liability theory. We have repeatedly treated cases involving claims of inadequate security as premises-liability cases.[52] Today's case, largely based on Del Lago's failure to properly use its security resources, does not warrant different treatment. We have recognized that negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury,[53] while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe.[54] This case was properly tried and submitted as a premises-liability case, as Smith primarily complained of Del Lago's nonfeasance—its failure to remedy an unreasonably dangerous condition for ninety minutes and failure to react promptly once the fight started.

The lines between negligent activity and premises liability are sometimes unclear, since "almost every artificial condition can be said to have been created by an activity."[55] Smith complained of some conduct that might be cognizable as a negligent-activity claim, such as Del Lago's decision to move the patrons through a single exit immediately before the fight erupted, but Del Lago persuaded the trial court not to give Smith an alternative negligent-activity question. The error in not allowing Smith to pursue a separate negligent-activity claim, if any, occurred at Del Lago's behest. Even as to the allegation "that we herded them out the door," Del Lago argued at the charge conference that this evidence did *not* support a negligent-activity claim because "[t]here is no direct relation between Del Lago's conduct and Brad's injury."

Further, the evidence regarding the bar staff's affirmative conduct was relevant to issues of negligence and causation under the premises-liability claim, since Smith could and did properly contend under this theory that instead of using due care to make the premises safe by calling security or closing early, Del Lago made the unrea-

---

**51.** *See* Tex.R.App. P. 53.2(f), 55.2(f).

**52.** *See Timberwalk Apartments*, 972 S.W.2d at 753 (holding, in inadequate security case, that jury was properly charged under premises-liability theory rather than negligent-activity theory); *Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654, 655 & n. 3 (Tex.1999) (plurality opinion) (discussing, in inadequate security case, prior "premises liability cases" and noting that Court's analysis "is complementary, not contradictory, to the traditional premises liability categories"); *id.* at 661 (Enoch, J., concurring) ("Thus, we are left with the traditional premises liability classifications to determine Mellon's duty."). We also note that in *Trammell Crow Central Texas, Ltd. v. Gutierrez*, 267 S.W.3d 9 (Tex.2008), another inadequate security case, we did not expressly address the issue of whether premises liability

versus negligent activity applied, but we decided the case by closely following the rules set out in *Timberwalk Apartments*, which in turn expressly rejected the argument that an inadequate security case should be tried under a negligent-activity theory instead of a premises-liability theory.

**53.** *See Timberwalk Apartments*, 972 S.W.2d at 753 (" 'Recovery on a negligent activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself . . . .' ") (quoting *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex.1992)).

**54.** *Id.* (describing premises liability as "failing to remedy an unreasonable risk of harm due to the condition of premises").

**55.** *Keetch*, 845 S.W.2d at 264.

sonably dangerous condition worse by continuing to serve drinks and funneling the hostile factions into closer physical contact. In any event, Del Lago makes no argument that the trial court improperly admitted evidence.

Finally, JUSTICE WAINWRIGHT does not explain what elements of a negligent-activity claim were not presented in the jury charge. To impose liability, the jury was required under the charge to find that Del Lago "failed to exercise ordinary care" to make an unreasonably dangerous condition safe, that "ordinary care" means the "degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances," and that this failure to use due care proximately caused Smith's injury. The trial court was concerned about giving Smith two bites at a negligence verdict in the charge, and we think it correctly noted that under the single question presented, Smith would "be able to argue exactly what [he has] argued in support of negligent activity."

### III. Conclusion

One need not believe that Del Lago has a universal duty to insure patrons' safety against all third-party crimes, or that prior criminal activity at Del Lago imposed a duty to post security guards in the bar at all times, in order to accept that on *this* record *this* sequence of conduct on *this* night in *this* bar could foretell *this* brawl. "Tort law does not provide a remedy for every harm," [56] nor must a bar call 911 for every blowhard drunk, but the record in this case documents that for an hour and a half Del Lago knowingly served rowdy and drunk rivals who were engaged in repeated and aggressive verbal and physical

confrontations. Tension at the bar turned into cursing, cursing led to threats, threats grew into pushing, and all of the above culminated in a full-scale brawl. Del Lago observed—but did nothing to reduce—this persistent hostility, and while the antagonism may have ebbed and flowed over those ninety minutes, the liquor simply flowed. Given this evidence, the jury was free to find Del Lago's response not just unalert but unreasonable, and we do not disturb that finding.

In summary, the jury heard nine days of sharply disputed evidence, chose what testimony to believe and which witnesses to credit, and carefully apportioned liability 51–49 percent against Del Lago, finding it breached its duty to remedy an unreasonably dangerous condition by doing nothing until after the free-for-all melee that injured Bradley Smith erupted. Accordingly, we affirm the court of appeals' judgment.

Justice HECHT filed a dissenting opinion, in which Justice JOHNSON joined.

Justice WAINWRIGHT filed a dissenting opinion.

Justice JOHNSON filed a dissenting opinion, in which Justice HECHT joined.

Justice JOHNSON, joined by Justice HECHT, dissenting.

Justice Hecht articulates what I believe is the correct view of a premises occupier's duty to invitees. I join his dissent.

I also dissent for further reasons, beginning with the Court's starting from an incomplete, and thus improper, premise as to the duty Del Lago owed to Smith. Citing *Western Investments, Inc. v. Urena,*

---

**56.** James R. Adams, *From Babel to Reason: An Examination of the Duty Issue,* 31    MCGEORGE L. REV. 25, 53 (1999).

162 S.W.3d 547, 550 (Tex.2005), and *Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 753 (Tex.1998), the Court says that "Smith was an invitee, and generally, a property owner owes invitees a duty to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition about which the property owner knew or should have known." 307 S.W.3d at 767. The Court's statement of duty is incomplete, is not supported by *Urena,* takes the Court's statement in *Timberwalk* out of context, and is at odds with the unobjected-to jury charge given in this case.

In *Urena,* a child living in an apartment complex was lured into an apartment by an adult resident of the apartments and sexually assaulted. *Urena,* 162 S.W.3d at 549. The resident who assaulted the child fled and could not be found. *Id.* The suit against the apartment complex was based on both ordinary negligence and premises liability theories. *Id.* at 550. The Court noted that premises liability is a special form of negligence, but the difference was not discussed in depth because it was not material to disposition of the case:

> We analyze Urena's negligence and premises-liability claims together. To prevail on her negligence cause of action, Urena must establish the existence of a duty, a breach of that duty, and damages proximately caused by the breach. *Premises liability is a special form of negligence where the duty owed to the plaintiff depends upon the status of the plaintiff at the time the incident occurred....*
>
> Negligence and premises liability, therefore, involve closely related but distinct duty analyses. But *we need not delve into this distinction to resolve this case because recovery under either cause of action is foreclosed in the absence of evidence that Front Royale's acts or omissions proximately caused L.U.'s injuries.*

*Id.* at 550–51 (emphasis added) (citations omitted). The Court referenced the duty owed by a premises occupier to an invitee briefly in the context of proceeding to the causation question on which it decided the case, but the Court did not re-examine the duty owed by a premises occupier to an invitee. *Id.*

In *Timberwalk,* the plaintiff was assaulted in her apartment by an intruder. *Timberwalk,* 972 S.W.2d at 751. The trial court submitted the case on a premises liability charge, and the jury found against the plaintiff. *Id.* at 752. The first issue the Court considered was whether the case was properly submitted as a premises liability case instead of a negligent activity case. *Id.* at 753. In determining that the case was properly submitted, the Court discussed in a brief manner the difference between the two theories of liability as to a premises occupier:

> In *Keetch v. Kroger Co.,* 845 S.W.2d 262 (Tex.1992), we explained the difference between liability for negligent activity and liability for failing to remedy an unreasonable risk of harm due to the condition of premises. "Recovery on a negligent activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity." Negligence in the former context means simply doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done. Negligence in the latter context means "failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier [of land] knows about or in the exercise of ordinary care should know about."

*Id.* (citations omitted). The Court determined that the case was properly submitted as a premises liability case, but the defendant had no duty to the plaintiff because the criminal assault was not foreseeable. *Id.* at 758–59. As in *Urena*, the Court was not undertaking to re-examine or re-define the duty owed by a premises occupier to an invitee. That duty had been specifically considered and explicitly addressed in *State v. Williams*, 940 S.W.2d 583, 584 (Tex.1996) (per curiam), which issued only two years before *Timberwalk*. There the Court directly considered the proper jury instruction to be used in a premises liability case. *Id.* The State contended that the duty imposed on it was to use ordinary care to either warn of an unreasonably dangerous condition or make it reasonably safe. *Id.* The Court held that a premises occupier is not liable to an invitee if the occupier either adequately warns of the condition or makes it reasonably safe:

> The State argues that it had a duty to warn or make safe, but not both. In other words, the State argues that it was not negligent unless it *neither* adequately warned Williams *nor* made the condition reasonably safe. Stated differently still, the State argues that it was not negligent unless it *both* failed to adequately warn Williams and failed to make the condition reasonably safe.... We agree with the State.... In *State Department of Highways & Public Transportation v. Payne*, 838 S.W.2d 235, 237 (Tex.1992), we held that to establish the liability of a premises owner, a plaintiff must prove that "the owner failed to exercise ordinary care to protect the [licensee or invitee] from danger." The owner can provide the required protection by either warning the plaintiff or making the premises reasonably safe. This statement of the duty eliminates the confusion caused by PJC 66.05.

*Id.; see also Harris County v. Eaton*, 573 S.W.2d 177, 180 (Tex.1978) (noting duty of the County as to a special defect was to "warn as in the case of the duty one owes to an invitee").

The differences between general negligence cases and suits against premises occupiers based on conditions of the premises are important. *See Urena*, 162 S.W.3d at 550. A premises occupier has specific duties of care. When a claim against the occupier is based on a condition of the premises, the jury is instructed on the specific elements of the occupier's duty and what must be proved before the plaintiff may prevail. *See Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex.1997).[1] In this case, Smith pleaded that his injury was caused by both Del Lago's negligent activity and a dangerous condition on the premises. He requested jury questions on both theories, but the trial court charged the jury only on the dangerous condition theory. Smith does not assert that the trial court erred by refusing to submit a jury question on negligent activity, nor does he complain of the jury instructions. Del Lago does not assert charge error. Thus, the parties' contentions and the evidence should be measured by the charge given. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex.2002).

Question 1 of the jury charge asked whose negligence, if any, proximately caused Smith's injuries. As relevant to Question 1 and the issue before us, the

---

1. Premises occupiers may be liable for injuries to invitees when the injuries are caused by (1) negligent activities of the occupier or (2) unreasonably dangerous conditions on the premises. *See Timberwalk*, 972 S.W.2d at 753.

charge contained the following instructions and definitions:

> "Proximate Cause" means that cause which, in a natural and continuous sequence, unbroken by any new and independent cause, produces an event, *and without which cause such event would not have occurred.* In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event, but if an act or omission of any person not a party to the suit was the "sole proximate cause" of an occurrence, then no act or omission of any other person could have been a proximate cause.

> With respect to the condition of the premises, **Del Lago** was negligent if-
> (a) the condition posed an unreasonable risk of harm, and
> (b) Del Lago knew or reasonably should have known of the danger, and
> (c) Del Lago failed to exercise ordinary care to protect Bradley Smith from the danger, *by both failing to adequately warn Bradley Smith of the condition and failing to make that condition reasonably safe.*[2]

> "Ordinary Care," when used with respect to the conduct of **Del Lago** as an owner or occupier of a premises, means that degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances. (emphasis added).

Under the jury charge, Smith's burden was to prove Del Lago negligent by proving it failed in two regards: (1) it failed to use ordinary care to adequately warn of the condition posing an unreasonable risk of harm and (2) it failed to use ordinary care to make the condition reasonably safe. Because Del Lago could have been negligent only if it failed to act with ordinary care in regard to both, it is not liable unless that negligence, including both components, proximately caused Smith's injury.

The Court's statement of Del Lago's duty and its analysis of the case focuses only on Del Lago's duty to make a dangerous condition reasonably safe. In doing so, the Court neglects part of Smith's burden of proof: that Del Lago failed to use ordinary care to adequately warn him of the condition about which he complains.

I would hold that under these facts, Del Lago did not violate a duty of ordinary care to warn Smith of a condition that he did not need to be warned about. I would also hold there is no evidence that even if Del Lago breached a duty of care, the breach proximately caused Smith's injuries.

To review the essence of the case, Smith and his fraternity friends were in Del Lago's Grandstand Bar Friday night until it closed at midnight, then returned on Saturday evening. Smith suffered injuries at approximately 1:30 a.m. on Sunday morning while he and other late-staying patrons of the bar were being ushered out of the bar at closing time. He complains that Del Lago failed to protect him from a condition he had known of for approximately an hour and a half, but his complaint is bottomed on the injury he suffered at the hands of an unknown assailant in a bar fight he was not initially involved in, yet chose to subject himself to. No one could identify who started the fight, why it started, or who injured Smith. Smith

**2.** *See Williams,* 940 S.W.2d at 584; *see also* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 66.4 (2006).

could not sue the unknown person who injured him, but he could and did sue Del Lago and recovered a judgment for over $1,400,000.

Smith complains that ongoing interaction between members of his fraternity and the wedding party was an unreasonably dangerous condition,[3] Del Lago knew of the condition or should have known of it, and Del Lago failed to provide proper security to protect patrons from injury in the event of a fight. Del Lago essentially asserts that there was no unreasonably dangerous condition on the premises that it knew of or should have known of, so it did not owe a duty to provide more security or take other action to protect patrons such as Smith. It also asserts that even if it did owe Smith a duty, the evidence is legally insufficient to support the findings that it breached the duty or that the breach proximately caused Smith's injury.

I agree with the Court that occurrences on and around the Del Lago premises *outside* the bar before the night of the incident are dissimilar from and do not support a finding that Del Lago should have foreseen the general risk that patrons of the Grandstand Bar would be assaulted in a brawl *inside* the bar. *See Timberwalk*, 972 S.W.2d at 758. The bar was not the type of secluded or out-of-the-way area where a robbery, sexual assault, or other similar crime might typically, and possibly foreseeably, take place. The bar was lighted and occupied by patrons and bar personnel up until closing time when

Smith was injured. Nor does the evidence establish sufficient prior occurrences inside or specifically related to the bar and similar to the events on the evening of Smith's injury so that Del Lago had a general duty to provide unusual amounts of security to protect patrons from assaults by other patrons. *See id.* The bar was not the scene of frequent fights, much less fights involving multiple participants.

On the other hand, there is no reason to relieve Del Lago of a duty of ordinary care to its bar patrons if a specific, unreasonably dangerous condition developed on its premises. *See, e.g., Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 754 (Tex. 1970); Restatement (Second) of Torts § 343 cmt. b (1965) ("To the invitee the possessor owes ... [the] duty to exercise reasonable affirmative care ... at least to ascertain the condition of the land, and to give such warning that the visitor may decide intelligently whether or not to accept the invitation...."). Here, the jury found, under the charge as given, that an unreasonably dangerous condition arose. That finding had evidentiary support in testimony by Smith and other persons that persons were drinking, loudly cursing, challenging each other, making hand gestures toward each other, and even occasionally physically pushing each other. Witnesses, including a police officer Del Lago employed during his off-duty hours as a security officer, testified that such behavior in a bar setting is the way a lot of fights happen.[4] The evidence is legally

---

3. Justice Wainwright argues persuasively that the activities in the bar were not conditions of the premises insofar as duties owed by Del Lago to invitees. Although I do not necessarily disagree with his analysis, the parties address the activities as being a premises condition, and the Court addresses them as such; thus I will do so.

4. Smith also urges that the lack of sufficient security was part of the condition. But the alleged insufficient security was not part of the condition posing a risk of harm; it was a component of Del Lago's action in meeting the duty Del Lago had to its invitees. Smith's argument that insufficient security was part of a premises condition conflates the condition alleged—the ongoing aggressive behavior of bar patrons—with the question of whether Del Lago exercised ordinary care to protect him from the condition.

sufficient to support the jury finding that conditions in the bar developed to the point that an unreasonable risk of harm was posed to bar patrons.

As Justice Hecht explains, Smith also fully knew of and was charged with knowledge of the condition at a time and under conditions giving him the choice of remaining in the bar and encountering the condition, or avoiding the conditions by leaving or taking other action—such as staying away from any fights that broke out. That should end the matter, but because it does not, the jury charge and burden of proof issues must be examined. Addressing those, I would hold that for two reasons, Del Lago is not liable for Smith's damages. First, Smith does not deny knowing full well about the condition he complains of. His knowledge of the condition, when he knew of it, and his ability to either encounter or avoid the condition should be balanced against Del Lago's duty to adequately warn him of the condition. I would hold that under the circumstances, Del Lago was not negligent because it did not breach a duty of *ordinary care* to warn Smith as a matter of law. Next, even assuming Del Lago was negligent, there is no evidence its negligence was a proximate cause of Smith's injury.

In *Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 521 (Tex.1978), this Court held that an invitee's knowledge of a dangerous condition does not relieve the premises occupier of its duty to the invitee.[5] In those situations in which the invitee's knowledge does not relieve the premises occupier of its duty, however, the invitee still must prove that the premises occupier failed to exercise ordinary care by failing to both adequately warn the invitee of the condition and take action to make the con-

---

5. The rule in most states is to the contrary: the premises occupier has no duty to warn of open and obvious conditions when the danger can be fully appreciated and averted by a reasonable person. *See TXI Operations, L.P. v. Perry*, 278 S.W.3d 763, 771–72 n. 18 (Tex. 2009) (Hecht, J., dissenting) (listing jurisdictions holding that a landowner has no duty to warn of a condition of which the invitee is aware, or should be aware of). The rationale underlying this doctrine is that " 'the open and obvious nature of the hazard itself serves as a warning. Thus, the owner or occupier may reasonably expect that persons entering the premises will discover those dangers and take appropriate measures to protect themselves.' " *See Armstrong v. Best Buy Co.*, 99 Ohio St.3d 79, 788 N.E.2d 1088, 1089 (2003) (quoting *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 597 N.E.2d 504, 506 (1992)). This is also the rule of the Restatement (Second) of Torts, and in many other contexts, is the law in Texas. RESTATEMENT (SECOND) OF TORTS § 343 (1965); *see, e.g., Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 218 (Tex.2008) (premises owner owes no duty to warn an independent contractor's employees of an open and obvious danger); *Stephen F. Austin State Univ. v. Flynn*, 228 S.W.3d 653, 660 (Tex.2007) (explaining that the recreational use statute does not obligate a landowner to warn of known conditions); *Jack in the Box, Inc. v. Skiles*, 221 S.W.3d 566, 568 (Tex.2007) (per curiam) (noting that an employer owes no duty to warn of hazards that are commonly known or already appreciated by the employee); *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 184 (Tex.2004) (holding that product seller owes no duty to warn of commonly known risks of the product's use); *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 387–88 (Tex.1991) (holding there is no duty to warn of risks associated with prolonged and excessive alcohol consumption because such risks are common knowledge).

Jurisdictions retaining the open-and-obvious risk doctrine have also logically concluded that a landowner has no duty to an invitee to warn or make safe known and obvious conditions when the invitee has assisted in creating the conditions; under such circumstances, a landowner should anticipate the invitee will avoid harm from the known condition and warning is unnecessary. *See, e.g., Baber v. Dill*, 531 N.W.2d 493, 496 (Minn. 1995) ("To hold a landowner has a duty to warn an invitee of danger created, in part, by that individual is untenable.").

dition reasonably safe. In *Williams,* the Court specifically approved the format of the jury question and instructions given in this case. *Williams,* 940 S.W.2d at 584–85.

The Court says that there are some conditions for which no warning could possibly be adequate. Assuming that is so, for the sake of argument, it cannot be the case here because several of Smith's witnesses testified that the possibility of a fight was evident for a long period of time and one of Smith's witnesses, a fellow fraternity brother, testified that he did not enter the fight when it started because he did not want to go to work with a black eye. Clearly the "condition" was one for which an adequate warning could have been given if one were needed. By diminishing the importance of the duty to warn that invitees must prove premises occupiers breached in order to prove liability, the Court moves premises liability law close to that of simple ordinary negligence.

In its third issue, Del Lago argues that there is no evidence it breached its duty to Smith. Smith argues that there is evidence Del Lago knew of an escalating situation but took no action to defuse it or call security to protect bar patrons. Del Lago focuses on the credibility of the witnesses. It urges that Smith and his witnesses were not believable as to what took place during the evening while the believable evidence—that to which Del Lago's witnesses testified—is conclusive on the question of whether security was sufficient for the conditions. I disagree with Del Lago as to its credibility assertion. The record supports the jury's determination that at least some of Smith's testimony was credible. Nevertheless, I would hold that Del Lago did not breach its duty to Smith and was not negligent.

The purpose of requiring premises occupiers to warn invitees of unreasonably dangerous conditions is to provide the invitee with a choice at a time and place where the invitee can decide (1) whether to come onto or remain on the premises, accept the risk of harm posed by the condition, and take action to avoid or protect himself from the risk or (2) refuse to accept the risk by either not coming onto the premises or by leaving. *See* RESTATEMENT (SECOND) OF TORTS § 343 cmt. b (1965) (stating that the possessor owes the duty "to give such warning that the [invitee] may decide intelligently whether or not to accept the invitation, or may protect himself against the danger if he does accept it"); *see also Bill's Dollar Store, Inc. v. Bean,* 77 S.W.3d 367, 370 (Tex.App.-Houston [14th Dist.] 2002, pet. denied). As to Smith, a warning by Del Lago would have been similar to a passenger telling a driver who was consciously exceeding the speed limit that exceeding the speed limit could result in a ticket for speeding. Such a statement is not a warning, it is a superfluous reminder of what the driver already knows.

At some point, the ordinary care standard must mean something. I would hold that it means something here. The question is, would reasonable persons exercising ordinary care in Del Lago's position have gone around the room telling Smith and other adult members of the groups who were in the bar after midnight and into the wee hours of the morning about what was occurring and that there was potential for a fight? I think not. *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL HARM § 7 cmt. l (Proposed Final Draft No. 1, 2005) ("Sometimes reasonable minds cannot differ about whether an actor exercised reasonable care.... In such cases, courts take the question of negligence away from the jury and determine that the party was or was not negligent as a matter of law. Courts sometimes inaptly express this result in terms of duty....

[T]hese cases merely reflect the one-sidedness of the facts bearing on negligence...."). Such actions would not have added to Smith's knowledge, and to require them imposes a requirement of meaningless ritual. And more to the point, should tort liability attach because Del Lago's personnel did not do so? Smith's knowledge under these facts gave him the same knowledge and opportunity to avoid potential harm from the condition as if he did not know of the escalating conditions in the first place and Del Lago had given him an adequate warning of the conditions and the ultimate fight. His knowledge, considering when he obtained it and the adequacy of the choices that were available to him, must be weighed when determining whether Del Lago failed to act with ordinary care to warn him. The greater Smith's knowledge of the condition, the less an ordinary person would believe Smith needed warning. Once his knowledge reached the level of what an adequate warning would have conveyed, as it did that evening and early morning, Del Lago's duty of ordinary care to warn should be deemed fulfilled as a matter of law. I would hold, as a matter of law, that under these facts Del Lago did not breach its duty of ordinary care to warn Smith.

The purpose of the law is not to make the premises occupier an insurer of its invitee's safety and thus insulate an invitee from all risk of injury, but rather to afford the invitee sufficient knowledge and reasonably available choices to make an informed decision about whether to encounter or avoid a condition. It is contrary to both common sense and logic to impose liability on Del Lago because its employees did not warn Smith during the evening that "members of Sigma Chi and a wedding party are drinking, acting belligerently toward and threatening each other," or take similar action when, according to Smith's own testimony, he knew as much

as the warning would have conveyed. Parties should be held liable in tort because they did or failed to do something substantive that caused injury to another, not because they performed or failed to perform meaningless acts. If it is otherwise, premises occupiers can be held liable for failing to perform a meaningless act, as is being done to Del Lago here.

Further, even assuming Del Lago was negligent, I would hold that there is no evidence its negligence was a proximate cause of Smith's injury. One reason is there is no evidence the absence of the warning was a cause-in-fact of the injury. A second reason is there is no evidence that even if security had been present earlier and at the time of the fight, or if Del Lago personnel had taken actions such as escorting rowdy patrons out of the bar, the person or persons who started the fight and the person who injured Smith would not have been present at the time of the fight.

As to the first reason, proof of cause-in-fact ("but-for" causation) requires evidence that the negligent act or omission was a substantial factor in bringing about the injury and that absent the act or omission, the harm would not have occurred. *See Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995). Thus, Smith was required to prove that the absence of a warning by Del Lago was a substantial cause of his injury and that his injury would not have occurred but for the absence of the warning. *See id.* Including both the warning and "making safe" elements in one instruction did not lessen Smith's burden to prove that both elements proximately caused his injury. *See Williams,* 940 S.W.2d at 584 ("The State argues that it had a duty to warn or make safe, but not both.... We agree....").

Under some circumstances, when a defendant has the duty to give a warning, the plaintiff is aided by a rebuttable presumption that a warning would have been heeded if it had been given. *See, e.g., Gen. Motors Corp. v. Saenz*, 873 S.W.2d 353, 357–59 (Tex.1993); *Tex. Dep't of Transp. v. Fontenot*, 151 S.W.3d 753, 765 (Tex. App.-Beaumont 2004, pet. denied); *see also Barron v. Tex. Dep't of Transp.*, 880 S.W.2d 300, 304 (Tex.App.-Waco 1994, writ denied). But even when such a presumption applies, it is rebutted by evidence from which an inference can be drawn that the plaintiff would not have reacted differently if a warning had been given. *See Saenz*, 873 S.W.2d at 358–59. For example, the presumption is rebutted by evidence suggesting that the plaintiff knew the information a warning would have provided but nevertheless knowingly and voluntarily chose to face the risk. *See Guzman v. Synthes (USA)*, 20 S.W.3d 717, 720–21 (Tex.App.-San Antonio 1999, pet. denied); *see also Stewart v. Transit Mix Concrete & Materials Co.*, 988 S.W.2d 252, 256–57 (Tex.App.-Texarkana 1998, pet. denied). Once the presumption is rebutted, it ceases to play any part in determining causation. *See Saenz*, 873 S.W.2d at 359.

As noted above, and also by the Court and Justice Hecht, Smith knew all the information an adequate warning by Del Lago would have conveyed. He testified that he was aware of the tension between the groups, he witnessed episodes he described as "severe escalation," and at least an hour before the fight he saw men yelling, "squaring up chest to chest, kind of in a standoff," and "taunting back and forth." He also testified that when the fight finally broke out, he knew of the fight because he saw it even though he was not part of it. As Smith put it in his brief to this Court:

> Smith was not fighting and was standing against the wall until he saw his friend Spencer Forsythe go down. Forsythe

was thrown against a wall and shoved to the floor. He was being kicked in the head, legs, and stomach when Smith leaned over and grabbed him by the shirt to pull him up and move him out of the bar.

There is no question about what Smith would have done if he had the knowledge a warning would have conveyed about the condition: he had the knowledge, yet he stayed in the bar with his friends until closing time and then moved from a place of safety into the fight after he knew it was occurring. Smith did not testify that a warning by Del Lago was necessary for him to know what was happening or that a warning would have affected his conduct or prevented his injury, and there is no other evidence that if he had been warned by Del Lago employees about the ongoing aggressive behavior and confrontations during the evening, the alleged lack of sufficient security, or even the fight itself, the warning would have made a difference to him. In short, there is no proof that but for Del Lago's failure to warn Smith of the condition, or even the fight itself, his injury would not have occurred. *See* RE-STATEMENT (THIRD) OF TORTS: LIAB. FOR PHYS-ICAL HARM (BASIC PRINCIPLES) § 18 cmt. c (Tentative Draft No. 1, 2001) ("To justify liability in a negligent failure-to-warn case, there must be a finding of causation—a finding that the warning, if given, would have prevented the harm that resulted . . . .").

Next, there is no evidence that the presence of security or the removing of rowdy persons from the bar would have prevented Smith's injury; in other words, that they were a cause-in-fact of his injury. In regard to the causation analysis, the facts in this case are similar to those in *East Texas Theatres, Inc. v. Rutledge*, 453 S.W.2d 466 (Tex.1970). There the Court

considered whether a theatre owner's failure to provide security proximately caused injury to a patron. The plaintiff was on the ground floor of the theatre when she was hit in the head by a bottle thrown from the balcony. *Id.* at 467. The plaintiff claimed, and the jury found, that persons in the balcony were acting in a rowdy manner during the movie, the theatre and its employees negligently failed to remove the rowdy persons, and the theatre's negligence proximately caused the plaintiff's injuries. *Id.* During the movie, there was "hollering" from patrons in the almost-full balcony and on the ground floor and paper and cups were falling or being thrown from the balcony. *Id.* at 467–68. After the movie ended, the plaintiff was leaving the theatre when she was hit in the head by a bottle thrown from the balcony. *Id.* at 467. No particular person in the balcony was identified during trial as having been rowdy, nor was the person who threw the bottle identified. *Id.* at 468. The Court assumed, without deciding, that the finding of negligence was supported by evidence, but held there was no evidence the negligence proximately caused the plaintiff's injuries. *Id.* at 468–69. The Court rejected two contentions of the plaintiff that are substantively the same as those made by Smith in this case: rowdy patrons could and should have been removed and the balcony should have been supervised more closely. *Id.* at 469. As to the first contention, the Court held there was no evidence the bottle-thrower was one of the rowdy persons, so even if the rowdies had been removed, there was no evidence the bottle-thrower would have been removed. *Id.* As to the second contention, the Court held that it was speculative to say supervision would have prevented the bottle-thrower from injuring the plaintiff because no one knew who did the throwing. *Id.*

In reaching its conclusion that Del Lago's failure to provide adequate security was a proximate cause of Smith's injuries, the majority relies on lay and expert testimony that a security presence in the bar during the ninety minutes that the two groups were confronting each other would have defused the situation and prevented the brawl at closing time. However, no one knew who or what started the fight as the patrons were leaving the bar. The testimony was that there was a press of bodies going out the door when all of a sudden "all heck broke loose." There was no evidence that only fraternity members and wedding guests were exiting the bar or that a member of one of the groups started the melee. There was no evidence about why the fight started, that is, for example, whether one of the fraternity or wedding group members started it because of earlier friction, or whether someone unrelated to either group took offense at a remark or insensitive touch or rub and threw a punch, or whether someone tripped and fell into another person who pushed back, thus starting a chain reaction of pushing and fighting. Nor was there testimony that a member of either the fraternity or wedding groups was the person who injured Smith or that the person who injured Smith was intoxicated or involved in the earlier jousting between the groups. Just as in *East Texas Theatres,* there is no evidence that if security had escorted rowdy patrons out of the bar earlier, the person or persons who started the fight would not have been present at closing time, the cause of the fight would have been eliminated, or the person who injured Smith by holding him in a headlock and hitting his head against the wall would not have been in the fight. *Id.* (stating that, unless the identity of the bottle-thrower was known, it was impossible to determine the effectiveness of the suggested control measures).

I would reverse the judgment of the court of appeals and render judgment that Smith take nothing.

Justice WAINWRIGHT, dissenting.

Bradley Smith was seriously injured in a bar fight at the Grandstand Bar on the premises of the Del Lago Golf Resort & Conference Center (Del Lago) in Montgomery, Texas. Smith claimed, among other things, that Del Lago had a duty to take steps to preclude a fight or to remedy an unreasonably dangerous situation—the bar fight—once it arose. The trial court submitted the case to the jury on a premises liability charge and declined to submit the proposed negligent activity charge. The jury determined that Del Lago was liable and apportioned 51% of the damages award to it and assessed 49% against Smith. The trial court rendered judgment on the jury's verdict, and the court of appeals affirmed.

We are once again presented with the question of when a premises owner or possessor is liable for the conduct of other persons that cause personal injury to an invitee on the property. Smith's case turns on the alleged contemporaneous acts and omissions of the Del Lago staff and invitees in the Grandstand Bar as he has made no complaint about the "condition of the land." Accordingly, this case presents not a premises liability but a negligent activity case, and the trial court erred by refusing to submit plaintiff's proposed submission on negligent activity. Smith erred, however, by failing to appeal to this Court the trial court's refusal of his negligent activity submission. Smith's claim should not succeed on a premises liability theory because he failed to identify a necessary predicate of a premises liability claim—i.e., a physical defect in the condition of the premises. And Smith's allegation of inadequate security fails as a premises claim because he did not establish an unreasonable risk of serious harm necessary for Del Lago to owe him a duty. Because the Court approves Smith's recovery as a premises liability claim, I respectfully dissent.

## I. Smith's Claim Is Not One for Premises Liability

The days of the general demurrer when claims would live or die on the basis of the form of the pleading generally are gone. But the cause of action pled dictates the answers to important questions in a case. The pleading defines the elements of a claim, facts to be proven, potential defenses to recovery, and damages recoverable. A strict liability products claim is different from a negligence claim that seeks the same damages arising from the same product and the same incident. *See Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 181 (Tex.2004). A simple breach of contract claim arising from a transaction is not a tort claim, artful pleading notwithstanding. *See Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex.1991). Similarly, a cause of action for premises liability is different from one for negligent activity. In *Keetch v. Kroger Co.* and *Timberwalk Apartments, Partners, Inc. v. Cain*, we explained the difference between liability for negligent activity and liability for failing to remedy an unreasonable risk of harm arising from the condition of a premises:

> "Recovery on a negligent activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity." Negligence in the former context means simply doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done. Negligence in the latter context means "failure to use ordinary

care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier [of land] knows about or in the exercise of ordinary care should know about." *Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 753 (Tex.1998) (quoting *Keetch v. Kroger Co.,* 845 S.W.2d 262, 264, 267 (Tex.1992)). In short, unlike a negligent activity claim, "a premises defect claim is based on the property itself being unsafe." *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006).

In this case, Smith asserts he was injured when some members of his group of fraternity brothers and some members of a wedding party, all invitees, engaged in a fight at the Grandstand Bar, which had experienced no prior fights causing serious injuries. In this Court, rather than defend his position at the trial court that his cause of action was for negligent activity, Smith defends the trial court judgment on the premises liability claim. But this is not a case for damages caused by a pothole in a road, a slick floor from the misapplication of wax, a grape on a grocery store floor, the lack of adequate lighting in an apartment parking lot, or a trespasser's criminal attack on invited guests at a business. Although a species of negligence, premises liability cases are predicated on a property possessor's failure to warn or make safe dangerous or defective conditions on property; negligent activity cases arise from contemporaneous actions or omissions in the conduct of people. Smith's case is about the conduct of people at the bar, but the trial court's charge defines negligence "[w]ith respect to the condition of the premises," and instructs the jury that Del Lago was negligent if "the condition posed an unreasonable risk of harm...."[1] Smith did not identify any defective or dangerous physical condition of the premises.

The common law has recognized for a long time that the basis of a premises liability claim is a physical defect or condition on property. *See Kallum v. Wheeler,* 129 Tex. 74, 101 S.W.2d 225, 229 (Tex. Com.App.1937) (Where a building's decayed wooden floor gave way injuring a guest, the Court held "it appears to be settled in this state that one in possession of premises is under a duty to exercise ordinary care to make them safe" for invitees.). Relying on section 343 of the Restatement (Second) of Torts, we held that "[a] possessor of land is subject to liability for physical harm caused to his invitees *by a condition on the land.*" *Adam Dante Corp. v. Sharpe,* 483 S.W.2d 452, 454 (Tex. 1972) (Pope, J.) (emphasis added); *see also McKee v. Patterson,* 153 Tex. 517, 271 S.W.2d 391, 395 (1954) (involving an allegedly slick floor as a dangerous condition on the premises), *abrogated on other grounds*

---

1. The full text of the jury question follows:
   Did the negligence, if any, of those named below proximately cause the occurrence in question?
   With respect to the condition of the premises, Del Lago was negligent if—
   a. the condition posed an unreasonable risk of harm, and
   b. Del Lago knew or reasonably should have known of the danger, and
   c. Del Lago failed to exercise ordinary care to protect Bradley Smith from the danger, by both failing to adequately warn Bradley Smith of the condition and failing to make that condition reasonably safe.
   "Ordinary Care," when used with respect to the conduct of Del Lago as an owner or occupier of a premises, means that degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances.
   This is the Pattern Jury Charge submission for premises liability claims in which plaintiff is an invitee. STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES-MALPRACTICE, PREMISES, PRODUCTS PJC 66.4, at 137 (2006).

by *Parker v. Highland Park,* 565 S.W.2d 512, 517–18 (Tex.1978). Comments to section 343 discuss the "physical condition" of the land, the "actual condition of the premises and [duty] to make reasonably safe by repair or to give warning," and potential dangerous qualities "of the place itself and the appliances provided therein. . . ." RESTATEMENT (SECOND) OF TORTS § 343 cmts. b, d, f (1965). The Restatement also distinguishes between "Activities Dangerous to Invitees" addressed in section 341A and the section 343 topic of "Dangerous Conditions Known to or Discoverable by Possessor." *Id.* §§ 341A, 343. The First Restatement recognized a similar dichotomy. RESTATEMENT (FIRST) OF TORTS §§ 341, 343 (1939). Although the Restatement (Third) of Torts collapses the differing duties, based on the status of the injured party, into a unitary standard, it continues to recognize the distinction between "conduct by the land possessor" and artificial or natural "conditions" on the land. *See* RESTATEMENT (THIRD) OF TORTS § 51 (Tentative Draft No. 6, 2009).

Opinions of this Court consistently illustrate that premises liability claims arise from physical conditions or defects on property, including:

- A pothole in a dirt road allegedly causing a driver's neck injury, *TXI Operations, L.P. v. Perry,* 278 S.W.3d 763, 764–65 (Tex.2009);
- Ice from a soft drink dispenser making a grocery store floor slippery, *Brookshire Grocery Co. v. Taylor,* 222 S.W.3d 406, 407, 409 (Tex.2006);
- An unstable metal and wood platform accessing a storage shed, *CMH Homes, Inc. v. Daenen,* 15 S.W.3d 97, 98–99 (Tex.2000);
- Leaking water making a basketball court slippery, *City of San Antonio v. Rodriguez,* 931 S.W.2d 535, 536–37 (Tex.1996);

- Store abduction occasioned by premises owner's disconnection of existing security alarm devices, poor external lighting, and failure to have two clerks on a late night shift, *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 457, 459 (Tex.1992).
- Plant spray making a floor slick, *Keetch v. Kroger Co.,* 845 S.W.2d 262, 264 (Tex.1992);
- Grapes from a self-service grape bin falling on the floor and making a grocery store floor slippery, *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 297 (Tex.1983);
- An unlit apartment stairwell where there was no other exit route, *Parker v. Highland Park, Inc.,* 565 S.W.2d 512, 513–14 (Tex.1978);
- Misapplication of wax making a floor dangerously slick, *State v. Tennison,* 509 S.W.2d 560, 561 (Tex.1974);
- Soapy foam making a spa floor slippery, *Adam Dante Corp. v. Sharpe,* 483 S.W.2d 452, 453–54 (Tex.1972);
- Showroom rug alleged to be a tripping hazard, *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 753 (Tex. 1970); and
- A decayed wooden floor in a building through which a guest fell, *Kallum v. Wheeler,* 129 Tex. 74, 101 S.W.2d 225, 226–27 (Tex.Com.App.1937).

In contrast to physical conditions, we have recognized that negligent activity claims arise from:

- Failure to warn taxi drivers not to carry guns, *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 524–25 (Tex.1990);
- Independent contractor's operation of a mechanical pump on property, *Abalos v. Oil Dev. Co. of Tex.,* 544 S.W.2d 627, 628, 631 (Tex.1976); and

- Failure to remove "rowdy" patrons before one such patron allegedly threw a bottle injuring another patron in a theater, *E. Tex. Theatres, Inc. v. Rutledge*, 453 S.W.2d 466, 467–68 (Tex. 1970).

Smith fails to implicate any premises condition at the Grandstand Bar in causing his injury.

Texas law also recognizes a duty of premises owners to take reasonable measures to prevent injury occasioned by the criminal conduct of trespassers, or third parties, if the type of harm is unreasonable and foreseeable. *Timberwalk*, 972 S.W.2d at 756. We have analyzed these claims as premises liability claims. Assuming the existence of an unreasonable risk of harm, property owners have a duty to act within reason to prevent the harm if evidence of the *Timberwalk* factors establish foreseeability.[2] *See e.g., Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 15 (Tex.2008); *Timberwalk*, 972 S.W.2d at 757.

In *Timberwalk*, we held that an apartment complex did not have a duty to protect a tenant from sexual assault by a stranger because that type of serious crime was not foreseeable. The injuries and criminal violations in the past had not made that type of crime one the premises owner knew or should have known was likely to occur, thereby prompting a legal duty to take reasonable precautions to prevent it. 972 S.W.2d at 758–59. The Court approved the plaintiff's pleading of the dispute as a premises liability case allegedly brought about by the defendants' failure to provide adequate security measures and the absence of allegations that she was "injured by or as a contemporaneous result of any activity of defendants." *Id.* at 753 (quoting *Keetch*, 845 S.W.2d at 264). The Court, significantly, noted that the alleged inadequate security measures included defective physical security-related components—missing "charley" bars or pin locks for sliding glass doors, inoperative alarm systems in the apartments, inadequate lighting, inoperative access gates to the complex and the absence of security guards. *Id.* at 751.

In *Trammell Crow*, we again analyzed a dispute as a premises liability claim where plaintiff alleged negligently inadequate security to prevent a third party from shooting an invitee who was leaving a movie theater on the premises. 267 S.W.3d at 11–12. We held there was no duty to prevent the shooting because any prior criminal activity at the mall was not sufficiently similar and frequent to give rise to a duty to prevent the death. *Id.* at 17.[3]

---

**2.** The *Timberwalk* factors are "whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given the occurrences to indicate that the landowner knew or should have known about them." *Timberwalk*, 972 S.W.2d at 757.

**3.** *Mellon Mortgage Co. v. Holder* is a difficult case to categorize. 5 S.W.3d 654 (Tex.1999). In *Mellon*, an on-duty police officer stopped Holder, took possession of her drivers license, and instructed her to follow him. *Id.* at 654. He led her to Mellon Mortgage's parking garage and assaulted her in his squad car. *Id.*

Plaintiff sued Mellon Mortgage. *Id.* The Court was sharply divided in the case as there was only a plurality opinion. *See generally id.* No invitees were injured by third parties who came onto the property, and there was no contemporaneous activity that the premises owner knew or should have known about. *Id.* This case does not fit neatly under the typical premises liability or negligent activity rubric. Without determining whether Holder was an invitee, licensee, or trespasser, the Court resolved the case by concluding no duty arose in any event because foreseeability principles limited the scope of the defendant's duty. *Id.* at 658.

All of these cases raising premises liability claims for third party injury to persons legally on the premises concern, to some degree, the alleged failure of defendants to employ adequate security measures. These security measures could be inadequate lighting, disconnected existing alarm systems, broken pin locks for sliding glass doors, inoperative security gates, an unrepaired opening in a security fence, or the absence of guards for business parking lots. *See Timberwalk,* 972 S.W.2d at 751; *Lefmark Mgmt. Co. v. Old,* 946 S.W.2d 52, 55 (Tex.1997). These types of premises liability cases have in common the existence of defective physical conditions of the premises that allegedly allowed the criminal conduct to occur. The plaintiffs showed a nexus between their injuries and some physical defect or inadequacy in the property. Here, Smith implicates no physical condition of the property in his complaints.

Accordingly, Smith appropriately offered a negligent activity charge in the trial court, and the trial court erred in refusing it. *See Keetch,* 845 S.W.2d at 264. He claims that the acts and omissions of the Grandstand Bar staff during the evening were negligent. However, Smith erred in failing to appeal the trial court's improper submission of this case to the jury as a premises liability claim. Because the Court approves the award in this case on a premises liability charge (with respect to the "condition of the premises"), it opens almost any negligence dispute involving contemporaneous activities to being tried as a premises case. The Court's opinion is untethered to our long line of precedents drawing a distinction between negligent activity and premises liability causes of action.

## II. Smith Fails to Show That the Risk of Harm Was Unreasonable

Smith also fails to establish that Del Lago owed a duty to prevent the type of injury he suffered. Premises owners are not obligated to insure the safety of invitees on their premises. However, a premises owner has a duty to protect invitees if he knows or has reason to know of an "unreasonable and foreseeable risk of harm to the invitee." *Timberwalk,* 972 S.W.2d at 756 (quoting *Lefmark,* 946 S.W.2d at 53); *see also TXI Operations,* 278 S.W.3d at 764–65; *Trammell Crow,* 267 S.W.3d at 12; *CMH Homes,* 15 S.W.3d at 101; *Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 21 (Tex.1993). The common law imposes this duty on premises owners based on the rationale that, as between an invitee and a premises owner, the premises owner is in the better position to know of and take precautions against the risk of such harm. *Tidwell,* 867 S.W.2d at 21.

Although foreseeability has received the lion's share of the attention of Texas courts considering this duty, for premises owners to have a duty to protect invitees, the risk of harm must also be unreasonable. *TXI Operations,* 278 S.W.3d at 764; *Lefmark,* 946 S.W.2d at 53. The question is not whether the harm itself is unreasonable, but whether the risk of that type of harm occurring is unreasonable. A great harm may not, but a small harm may, be unreasonable, depending on the risk of it occurring.

To determine whether the risk of this type of harm was unreasonable, courts must weigh the type of risk involved, the likelihood of injury and its magnitude—including the nature, condition, and location of the defendant's premises—and the harm to be avoided by imposing a duty, against the consequences of placing the burden on the defendant. *See Trammell Crow,* 267 S.W.3d at 18 (Jefferson, C.J., concurring); *Gen. Elec. Co. v. Moritz,* 257 S.W.3d 211, 218 (Tex.2008); *Timberwalk,*

972 S.W.2d at 759 (Spector, J., concurring); *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990); *see also Ann M. v. Pac. Plaza Shopping Ctr.,* 6 Cal.4th 666, 25 Cal.Rptr.2d 137, 863 P.2d 207, 212 n. 5 (1993) (explaining that courts weigh foreseeability of the harm against other factors, including the burden imposed on the premises owner); *McClung v. Delta Square L.P.,* 937 S.W.2d 891, 902 (Tenn.1996) (holding that duty is determined by balancing the likelihood and gravity of harm against the burden imposed on the premises owner to prevent the harm). For example, if a premises owner could easily prevent a certain type of harm, it may be unreasonable for the premises owner not to exercise ordinary care to address the risk. On the other hand, if the burden of preventing the harm is unacceptably high, the risk of the harm is not unreasonable. *See Ann M.,* 25 Cal. Rptr.2d 137, 863 P.2d at 215.

In determining whether Del Lago had a duty to protect against this type of crime, we consider whether Del Lago knew or should have known of the likelihood of this type of crime before Smith's accident. The evidence shows only one crime and approximately four undocumented incidents per year in the Grandstand Bar, only one of which involved several people. Most of the incidents that had occurred at the Grandstand Bar, as the evidence shows, were relatively minor alcohol-induced physical and verbal altercations that quickly resolved without intervention, or minimal intervention, by Del Lago security. The likelihood of a fight at the bar involving several people was very low; nothing similar in size or scale had occurred in the past. *See Trammell Crow,* 267 S.W.3d at 17 (protecting premises owners from liability for "crimes that are so random, extraordinary, or otherwise disconnected") (footnotes omitted).

That does not end the analysis, however. In determining the likelihood of injury, case law focuses on the nature, condition, and location of the defendant's premises to determine if Del Lago's Grandstand Bar was a dangerous place or a relatively safe facility. *Timberwalk,* 972 S.W.2d at 759 (Spector, J., concurring). In this case, nothing about the premises indicates that this type of serious injury was imminent, as it never had occurred at Del Lago before. *See Trammell Crow,* 267 S.W.3d at 19 (Jefferson, C.J., concurring). The Grandstand Bar was part of an upscale resort. It did not border an area or particular establishment that posed a threat to Del Lago's invitees, have a conspicuous lack of security that would encourage criminal behavior, or otherwise attract or indicate impending criminal activity. The lack of such evidence here weighs against imposing a duty on Del Lago.

The likelihood of Smith incurring this type of serious injury was relatively low. Again, we examine the harm to be avoided from Del Lago's perspective before the fight that injured Smith. The typical harm resulting from the incidents at the Grandstand Bar that previously occurred and were most likely to occur again— alcohol-induced scuffles—resulted in only minor injuries, such as bruises and scrapes. Even a larger-scale scuffle would typically involve only those same types of minor injuries, but perhaps to more than one person. *See Trammell Crow,* 267 S.W.3d at 19 (Jefferson, C.J., concurring) ("Because the relatively few incidents of violent crime at the Quarry Market during the two-year period before Gutierrez's death did not pose an unreasonable risk of harm, and in light of the tremendous burden that would be required to prevent such brazen attacks, I would hold that Trammell Crow owed Gutierrez no duty to prevent this crime.").

Weighing the above considerations against the burden to be imposed on a premises owner, the law considers not the burden of preventing crime on the premises of Del Lago in general, but the imposition of a further duty to prevent this particular type of serious crime from occurring in the Grandstand Bar itself. Smith also argues that Del Lago had a duty to post a security guard in the bar. The security personnel at Del Lago were experienced and well-trained. They consisted of two off-duty police officers, Shenandoah Chief of Police John Chancellor and Lieutenant Lanny Moriarty of the Montgomery County Sheriff's Office, who had a combined fifty years of police experience, as well as Director of Security and Safety Ruben Sanchez, a twenty-year veteran fireman and paramedic, and the Manager–on–Duty Ken Jeffrion. Smith did not dispute at trial that the size of the security staff was adequate. On the night in question, Chancellor and Moriarty were patrolling together in a golf cart on the grounds of Del Lago, which included the golf course, a group of cottages, and a hotel. Del Lago had a substantial security force.[4] Reallocating the security guards from patrol could leave the rest of the premises understaffed, especially when most of the documented crimes— and arguably the more serious incidents— occurring on the resort premises did not occur at the Grandstand Bar, but instead on other parts of the 300 acres.

Although Del Lago could have taken extraordinary measures to prevent this type of bar altercation, the law does not require premises owners to take draconian measures to prevent all unlikely but theoretically conceivable types of crime. *Timberwalk*, 972 S.W.2d at 756; *see also Boren v. Worthen Nat'l Bank of Ark.*, 324 Ark. 416, 921 S.W.2d 934, 941–42 (1996). It is neither feasible nor desirable to impose such a requirement because of both the additional cost and the chilling effect it could have on the activities of invitees. While there may have been a risk of alcohol-induced altercations in the Grandstand Bar, the frequency, recency, and severity of prior incidents do not indicate that the risk of harm of this magnitude was unreasonable. Del Lago may have had a duty to act reasonably to prevent the typical scuffle from occurring at the Grandstand Bar, but that duty is less onerous than the one Smith demands and would not impose an inordinate burden on Del Lago. However, to require Del Lago to take further security measures—including, for example, the added cost of increased security training for all personnel and adding at least one stationary guard in the Grandstand Bar—would impose unreasonably large costs in order to prevent a type of crime that had never before occurred at the resort and may never occur again. *See Posecai v. Wal–Mart Stores, Inc.*, 752 So.2d 762, 768 (La.1999) ("The economic and social impact of requiring businesses to pro-

---

**4.** If I were considering foreseeability, applying the *Timberwalk* factors to the claim that there was a duty to place security guards in the bar would result in the conclusion that, based on past experience, it was not foreseeable that a serious injury would occur. The evidence showed twelve prior crimes on the 300–acre Del Lago resort property in the three years preceding Smith's assault. Four of the twelve crimes were assaults in or near the Grandstand Bar, and eight were assaults in other portions of the resort. Officer Chan-

cellor, employed by Del Lago, testified that he was called to the Grandstand Bar approximately five times per year for incidents that received no documentation. Officer Sanchez estimated he is called to the Grandstand Bar every two to three months to intercede in an argument. None of the incidents was of a magnitude to cause serious injury to the persons involved. Hence, there was no duty to provide security guards in the bar or additional security at Del Lago.

vide security on their premises is an important factor.").

The analysis of whether the risk of crime is unreasonable must always be determined based on what the premises owner knew or should have known before the criminal act occurred. Del Lago took many, considerable steps to avoid risks of reasonable harm. The security at the Del Lago resort that evening was very experienced and well-trained, and the adequacy of the number of guards on duty that night was not questioned. In this case, I would hold that the burden on the defendant outweighs the likelihood, magnitude, and risk of harm to be avoided, taking into account the visible presence of security guards and their quick response time,[5] the added cost and inconvenience of having additional personnel, allocating existing personnel differently, or requiring additional training—all designed to prevent an unprecedented, albeit dangerous, fight. Because there was not an unreasonable risk of a barroom fight occurring and a serious injury resulting therefrom, Del Lago had no duty to protect against the risk of serious harm.

The Court argues that the jury's verdict should supercede our determination of the duty issue. That approach places the cart before the horse because the existence of a duty is a predicate to liability in tort. *Moritz*, 257 S.W.3d at 217; *see also Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99, 101 (1928) ("The question of liability is always anterior to the question of the measure of the consequences that go with liability."). In the landmark case of *Palsgraf*, the court held, with Chief Judge Benjamin Cardozo writing, that whether action is required to prevent harm is a question of duty. *Palsgraf*, 162 N.E. at 101. Disagreeing with the court, dissenting Justice Andrews asserted that predicating negligence on the existence of a legal duty to take care is "too narrow a concept." *Id.* at 102 (Andrews, J., dissenting). He believed that "[w]here there is the unreasonable act, and some right that may be affected there is negligence...." *Id.* "Everyone," he wrote, "owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others." *Id.* at 103. Texas law does not define duty so expansively or, as the *Palsgraf* dissent, restrict limitations on duty only to the role of proximate cause. *Id.* Similarly, a duty arises from risks of harm that are both foreseeable and not unreasonable for premises owners to prevent.

Finally, the Court's description of the evening suggests that there was both a foreseeable and unreasonable risk of serious harm. First, there is no evidence that a serious injury ever occurred previously at the Grandstand Bar, described by the parties as an upscale bar. Establishing foreseeability or an unreasonable risk of serious harm in this case is a difficult climb. Second, the evidence does not portray a caldron of escalating events leading inevitably to a huge brawl. The testimony presented at trial paints a somewhat different picture of the events of the evening. No doubt the atmosphere in the Grandstand Bar was not calm and peaceful all evening. Members of the two groups exchanged heated words that night, and the physical confrontations in the bar happened "off and on" over the course of the evening. Smith and fraternity brothers Toby Morgan, Spencer Forsythe, and Michael Brooks testified that they witnessed shoving between some group members before the fight, but those situations diffused on their own. These incidents resolved themselves without staff intervention.

---

**5.** The first officer was on the scene of the fight about twenty seconds after being called. Two others arrived within two or three minutes of being called.

Both Arlene Duncan and Elizabeth Sweet, the bartender and cocktail waitress on-duty that night, testified that they certainly would have called security had they seen assertive physical behavior that would have led to a fight. "Tensions" between bar patrons alone do not constitute an unreasonably dangerous situation. Although there were people in the bar not part of either the fraternity reunion or the wedding party, Smith presented no evidence that even one bar patron complained about the behavior of the fraternity or wedding party members, called security, requested that security be called, left the bar to escape the situation, or otherwise expressed concern for his physical safety, either in word or deed.

In addition, the Court claims that the fight was a "closing-time melee involving twenty to forty 'very intoxicated' customers." The evidence shows that a number of people were in the *area* of the fight but only two to four people were involved in the actual fight. The length of the fight is also characterized as lasting fifteen minutes. Only one of the testifying witnesses stated that the fight lasted fifteen minutes. The other witnesses stated that the fight lasted between ten seconds and five minutes. This time frame is corroborated by the fact that when the first security officer arrived (within twenty seconds of being called), the fight was over. Though the Court disclaims creating a universal duty of these premises owners to prevent serious harm in these situations, its opinion paves a road in that direction.

### III. If a Duty Arose to Act During the Fight, the Standard of Conduct to Which Del Lago Is Held Is Very High

The case was submitted to the jury on a premises liability charge, and the Court confirms liability against Del Lago on a negligent activity analysis. If the case had been submitted as a negligent activity claim, then the jury would properly have considered whether Del Lago breached its duty to use ordinary care to make the premises reasonably safe once the altercation broke out. See *E. Tex. Theatres, Inc. v. Rutledge*, 453 S.W.2d 466, 469–70 (Tex. 1970). Smith argues that the Bar staff should have taken timely steps to stop the altercation. On the issue of breach of that duty, the evidence shows that the security personnel's response times that evening were exemplary,[6] and the liability finding in spite of the security response would be concerning, but for some evidence of delay in calling security sufficient that the jury could conclude that Del Lago breached this duty, as the facts show.

Once the fight began, the bartender and one of the waitresses took action. Duncan immediately attempted to break up the fight, while Sweet called security. Sweet testified that she was in shock when the fight arose, such that she could not immediately find the number. A sticker on the phone itself instructed "Dial 0 for Emergency," which directly connected to Del Lago's security when dialed. Instead, the waitress dialed the front desk, obtained the number for security, and then quickly gave it to another bar employee to alert security. Smith does not argue that the delay by the waitress in calling the front desk rather than security directly was a breach of Del Lago's duty. That is the only delay in this sequence of events that occurred that could constitute a breach. Del Lago's security force responded promptly to the calls. Sanchez, the first officer on the scene, arrived at the bar

6. The security personnel at Del Lago that evening included three officers with some sev- enty years of combined law enforcement and paramedic experience.

fifteen to twenty seconds after being called, and the fight was over when he got there. The other two officers arrived after Sanchez, within two to three minutes of being called. None of these facts is disputed. These are the response times we want in security personnel. I am persuaded not to conclude that Del Lago did not breach its duty in this regard only because of the one piece of evidence that is barely sufficient but on which the jury could conclude there was a breach—i.e., the waitress's testimony that it took her about three to four minutes to get the proper telephone number and give it to another employee to make the call to security. I would be concerned if the message from the Court is to hold premises owners to a standard of perfection, instead of a standard of reasonable care.

## IV. Conclusion

Because I believe the case was improperly submitted as a claim that it is not, I respectfully dissent. This dispute is either a premises liability case for alleged inadequate security (Smith's only allegation that raises a premises liability claim) or a negligent activity claim based on the contemporaneous acts or omissions of the Del Lago personnel and invitees, or it may be both if plaintiff articulates different facts in support of both claims. The charge for a negligent activity claim should not instruct the jury to find a dangerous "condition of the premises" as that finding addresses premises liability. I agree with the Pattern Jury Charge comment on this point that because the elements of these two theories are different, "it is important to submit the questions, instructions, and definitions that are applicable to the particular theory." COMM. ON PATTERN JURY

CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES, PRODUCTS PJC 65.1 (Comment), at 121 (2006). Submission of a premises liability charge for a negligent activity claim muddles the duties and undermines clarity in the law.

Justice HECHT, joined by Justice JOHNSON, dissenting.

The rule in Texas is that a possessor of land discharges his duty to protect an entrant from a condition that poses an unreasonable risk of harm by giving an adequate warning.[1] Now the Court tells us that "in some circumstances" no warning can be adequate. Which ones, exactly, the Court does not specify, saying only that Bradley Smith's full appreciation of the risk of injury from a bar fight "hardly seems" adequate.[2] So the rule has become that an adequate warning discharges a land possessor's duty except in circumstances when any warning hardly seems adequate. In other words, there is no rule, as the Court admits: "We do not announce a general rule today."[3] The land possessor who simply wants to be sure to avoid any exposure to liability is left without guidance.

The Court's application of its non-rule in this case portends a misguided change in the law. It is quite *possible* that Smith would not have been injured in a fight at the Grandstand Bar if the Del Lago Resort had provided better security. But it is quite *certain* he would not have been injured if he had left the Bar by either of its exits at any time during the 90 minutes he thought a fight was obvious, as he was completely free to do. The Court's holding in this case is that a possessor of land

1. *State v. Williams,* 940 S.W.2d 583, 584 (Tex. 1996) (per curiam).

2. *Ante* at 771 n. 32.

3. *Ante* at 770.

must protect an entrant from a potentially dangerous condition that any reasonable person could clearly see, fully appreciate, and easily avoid. This has never been the law of Texas. It is not the law in most states, and for good reason. It exposes a possessor of land to liability for harm that any reasonable person could have avoided.

The rule in section 343A(1) of the *Restatement (Second) of Torts* is to the contrary:

> A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.[4]

Based on this rule, I would reverse and render judgment for Del Lago. Accordingly, I respectfully dissent.

## I

Bradley Smith, 29, and a large crowd of his Sigma Chi fraternity brothers had been in the Del Lago Resort's Grandstand Bar for several hours celebrating their fraternity's 40th reunion when around midnight, in came a wedding party. Everyone had been drinking, and within a few minutes, a man in the wedding party apparently took umbrage at advances being made upon women in his party by the fraternity brothers. Recurrent shouting and shoving ensued for some 90 minutes, escalating in frequency and intensity with the approach of closing time. From the tension in the room, Smith—who recalled having had only one beer all night and could therefore clearly appreciate what was happening—thought it obvious to all there would be a fight. As one of the brothers testified at trial: "I mean, if you didn't know that this was going on, then you're either blind or deaf or don't care."

Security officers were on duty at the Resort, and had they been called to the Bar at the first sign of trouble, the fight that erupted in the doorway, just as the wait staff was insisting that everyone leave, might have been prevented. Smith was not part of that fight, but his friend Spencer Forsythe was. At trial, Forsythe recounted:

> Q [T]here were about forty Sigma Chi guys there, right?
>
> A I would say so.
>
> Q Ten or fifteen in the wedding party, right?
>
> A Right.
>
> \* \* \*
>
> Q And some of the Sigma Chi fellows down at one end of the bar are having some words with the people in the wedding party, right?
>
> A Right.
>
> \* \* \*
>
> Q So you were concerned when you saw this verbal altercation go on between your Sigma Chi friends and these wedding party friends that this thing could develop into a bar fight?
>
> A Sure.
>
> \* \* \*
>
> Q Then what happens is ... that a group of your friends—people you knew, right? Sigma Chi fellows?—moved, kind of, down towards the door? Not at the door, but towards the door, right?
>
> A Right.
>
> Q And we have some chest-thumping, that type of thing, right?
>
> A Right.
>
> Q And you chose to go to that fight, right?
>
> A Yes. I—yes, I did.

4. RESTATEMENT (SECOND) OF TORTS § 343A(1)    (1965).

Q   Were you sitting or standing at the bar?

A   I was actually—I was leaning on the bar.

Okay. You were leaning on the bar, and you looked down at the other part of the bar over here and you see some of your friends, and they're kind of doing the whole chest thing, the whole "I'm a tough guy" thing, right?

A   Right.

\*     \*     \*

Q   You walked right over here to it, didn't you.

A   Okay. Yes. Yes.

Q   You came—

A   Yes.

Q   You came over here to support your friends in the Sigma Chi, didn't you?

A   Right.

Q   You wanted to show some force and show that you were here for them?

A   Right. Yes.

Q   You made that decision?

A   I made that decision.

\*     \*     \*

Q   And then once you interjected yourself into that situation, now you're there, and now you're in the fight, right?

A   After a few minutes.  Yes.

Smith had not taken part in any of the evening's altercations and had stayed in another area of the Bar. He entered the fray at closing solely to rescue Forsythe. He testified at trial:

Q   Were you in any way in the middle of this?  Involved in the conflict?

A   No, ma'am.  I was actually up against—my right side was against this wall.

\*     \*     \*

Q   Now what was the extent of your involvement in this fight?  If you could, tell the jury.

A   The only involvement I had was going back in to get Spencer out.

Forsythe testified that he could have left at any time before the fight, and could have used the Bar's other exit, but chose not to:

Q   [T]here are a couple of exits out of The Grandstand, right?

A   Yes.

\*     \*     \*

Q   And you can use either one of those exits as long as it's during the hours of the club, correct?

A   Yes.

\*     \*     \*

Q   Did you, at that time, choose to leave the bar—

A   No.

Q   —through either exit?

A   No. I did not.

Q   Did, at that time, you say, "Look, let's go out to our cottages, and let's just hang out there;  these guys are too much of a hassle"?

A   No. No. I did not.

\*     \*     \*

Q   You could've invited several of the Sigma Chi fellows, say, "Let's go out to the cottage," or "Let's go back to the lobby," "Let's get away from the situation which now I'm concerned about", right?

A   Right.

Q   And you chose not to do that?

A   Right.

\*     \*     \*

Q   If you had chosen to take one of the two exits and go back to your cottage or go to some other part of the

resort, you wouldn't have been involved in that fight, right?

A  Right.

Presumably, Smith had the same options. Forsythe acknowledged that he could have asked for security to be called:

Q  Or if you'd chosen—since you said you were concerned about it—if you'd chosen to advise the wait staff to go get security, that fight wouldn't have happened, right?

A  Right.

\*   \*   \*

Q  If it was so obvious to you, Mr. Forsythe, that this verbal incident was going to break into a fight over here—if it was so obvious to you—why didn't you stop one of the wait staff and say, "I assume somebody's on the way; have you guys got somebody on the way?" Why didn't you do that?

A  I don't—why was it my responsibility?

There is no reason to think Smith could not have done the same. And Forsythe admitted that even inside the bar, he could have stayed completely out of the fight:

Q  Okay. Now, if you'd been sitting back over here, leaning up against the bar like you were before, you wouldn't have been in that fight, right?

A  Most likely. Right.

Smith, in fact, had stayed out of the fight until he ventured back to rescue Forsythe.

Another fraternity brother, Cesar Lopez, stayed out of the fight altogether because, as he testified: "I'm not a fighter. I had to go to work Monday morning. I didn't want to go to work with a black eye from some fight." He added:

Q  As soon as you saw that blows were happening, you said you backed away, you didn't want to get in a fight?

A  Right.

Q  Well, where did you go?

A  Back towards the bar.

Q  Okay. You played it safe?

A  Yes.

Q  You decided to play it safe and backed away?

A  Right.

Q  And you were not injured?

A  No.

Smith, like Lopez, could have played it safe.

## II

Smith's only claim, based on premises liability, is that Del Lago is liable for failing to protect him from an unreasonably dangerous condition in the Grandstand Bar, viz, the tension among the patrons that led to a fight. The settled rule in Texas is that a possessor of land "must either adequately warn" an entrant onto the property of an unreasonably dangerous condition "or make the condition reasonably safe";[5] he need not do both.[6] There

---

**5.** *TXI Operations, L.P. v. Perry*, 278 S.W.3d 763, 765 (Tex.2009); *accord State v. Williams*, 940 S.W.2d 583, 584 (Tex.1996) (per curiam); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex.1992); *see Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 295 (Tex.1983); *Adam Dante Corp. v. Sharpe*, 483 S.W.2d 452, 454–455 (Tex.1972) (overruled on other grounds, as noted in *Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 517–518 (Tex.1978), by *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 758 (Tex.1975)); *see*

*also* RESTATEMENT (SECOND) OF TORTS § 343 (1965).

**6.** *Williams*, 940 S.W.2d at 584 ("The State argues that it had a duty to warn or make safe, but not both. In other words, the State argues that it was not negligent unless it *neither* adequately warned Williams *nor* made the condition reasonably safe. Stated differently still, the State argues that it was not negligent unless it *both* failed to adequately warn Williams *and* failed to make the condi-

is no question that Smith was fully aware that a fight was brewing, not because of any sign displayed by the Bar, but because of events unfolding before his very eyes for 90 minutes, and that he had a ready means of avoiding all injury.

While an adequate warning discharges a land possessor's duty, as the Court says, "in some circumstances, no warning can adequately substitute for taking reasonably prudent steps to make the premises safe."[7] Those circumstances are to be found in *Parker v. Highland Park, Inc.*[8] Parker, a widow in her late 60s, tripped and fell at night in an unlit stairwell while descending from an apartment belonging to her sister and brother-in-law, the Masseys. It was obvious that the stairwell was dark and therefore dangerous, but there was no better way to leave. The Masseys escorted Parker down the stairs, Justice Massey leading the way while his wife held a flashlight to illuminate the steps, but Parker still stumbled and fell. We concluded that Parker was not precluded from recovery merely because the danger due to the darkness was obvious. No warning of tripping in the dark would have kept her from falling. She could see the danger for herself, and so could the Masseys. They used the only exit reasonably available and took every precaution.

But suppose Parker could have avoided all danger by using an identical, well-lit stairwell adjacent to the dark one. Would the landowner have been liable for letting the light go out in one stairwell when any reasonable person would be expected to take the other one? Surely the answer is no. The *Parker* case illustrates the situation in which no warning is adequate: when heeding it cannot prevent harm. Parker and Smith were both fully aware of the risk of danger. The crucial difference between Parker's situation and Smith's is that Parker had no realistic way of avoiding the risk of descending the darkened stairs, while Smith could easily have avoided being hurt in a fight by leaving early or through another exit. The risk of danger to Parker was unavoidable; Smith need not have run any risk at all.

A landowner may be liable for an unreasonably dangerous condition, even if it is open and obvious, but not if a reasonable person would avert harm. That is the rule of section 343A(1) of the *Restatement (Second) of Torts,* which states:

> A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.[9]

It is also the rule in most states.[10]

The Court argues that under *Parker,* the obviousness of a risk never relieves a

7. *Ante* at 771 n. 32; *see ante* at ——.

8. 565 S.W.2d 512 (Tex.1978).

9. RESTATEMENT (SECOND) OF TORTS § 343A(1) (1965). Contrary to the Court's suggestion, the proposed *Restatement (Third)* does not abandon section 343A(1). RESTATEMENT (THIRD) OF TORTS: LIAB FOR PHYSICAL AND EMOTIONAL HARM § 51, cmt. k (Tentative Draft No. 6, 2009) ("Section 343A(1) of the Restatement Second of Torts requires possessors to take reasonable precautions for known or obvious dangers when the possessor 'should anticipate the harm despite such knowledge or obviousness.' The duty imposed in this Section, as amplified in this Comment, is consistent with § 343A....").

10. *See Dolgencorp, Inc. v. Taylor,* 28 So.3d 737, 741–743 (Ala.2009) (adopting invitor's argument that it, by establishing its affirmative defense that the condition was open and obvious, negated its duty to invitee, and defeated invitee's injury claim without the oper-

ation of affirmative defenses like contributory negligence or assumption of the risk); *Kuykendall v. Newgent*, 255 Ark. 945, 504 S.W.2d 344, 345 (1974) ("The duties of owners and occupiers of land to business invitees usually end when the danger is either known or obvious to the invitee. However, most authorities ... recognize that under some circumstances a possessor of land may owe a duty to the business invitee despite the knowledge of the latter."); *Shanley v. Am. Olive Co.*, 185 Cal. 552, 197 P. 793, 794 (1921) ("[O]wner is entitled to assume that such invitee will perceive that which would be obvious to him upon the ordinary use of his own senses. He is not required to give to the invitee notice or warning of an obvious danger."); *Fleming v. Garnett*, 231 Conn. 77, 646 A.2d 1308, 1312–1313 (1994) (landowner has no duty to warn invitee of dangerous condition of which invitee was or should have been aware of); *Ashcroft v. Calder Race Course, Inc.*, 492 So.2d 1309, 1311–1312 (Fla.1986) ("A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." (quoting RESTATEMENT (SECOND) OF TORTS § 343A(1) (1965))); *LaFever v. Kemlite Co.*, 185 Ill.2d 380, 235 Ill.Dec. 886, 706 N.E.2d 441, 447–448 (1998) (same); *Konicek v. Loomis Bros., Inc.*, 457 N.W.2d 614, 618 (Iowa 1990) (same); *Bonn v. Sears, Roebuck & Co.*, 440 S.W.2d 526, 528–529 (Ky. 1969) (landowner owes no duty to warn of "dangers that are known to the visitor or so obvious to him that he may be expected to discover them"); *Isaacson v. Husson Coll.*, 297 A.2d 98, 105 (Me.1972) (adopting RESTATEMENT (SECOND) OF TORTS § 343A(1) (1965)); *Lloyd v. Bowles*, 260 Md. 568, 273 A.2d 193, 196 (1971) ("If the injured person knew or should have known of the dangerous condition, there is no right to recovery ... the reason for the latter ruling being that the [landowner's] liability is based on a presumption that he has greater knowledge concerning the dangerous condition than the invitee."); *O'Sullivan v. Shaw*, 431 Mass. 201, 726 N.E.2d 951, 954–955 (2000) ("Landowners are relieved of the duty to warn of open and obvious dangers on their premises because it is not reasonably foreseeable that a visitor exercising (as the law presumes) reasonable care for his own safety would suffer injury from such blatant hazards."); *Riddle v. McLouth Steel Prods. Corp.*, 440 Mich. 85, 485 N.W.2d 676, 680–681 (1992) ("[W]here the

dangers are known to the invitee or are so obvious that the invitee might reasonably be expected to discover them, an invitor owes no duty to protect or warn the invitee unless he should anticipate the harm despite knowledge of it on behalf of the invitee."); *Richardson v. Corvallis Pub. Sch. Dist. No. 1*, 286 Mont. 309, 950 P.2d 748, 755–756 (1997) (landowner owes no duty to warn "persons foreseeably upon the premises for physical harm caused to them by any activity or condition on the premises whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness"); *Tichenor v. Lohaus*, 212 Neb. 218, 322 N.W.2d 629, 632–633 (1982) (adopting RESTATEMENT (SECOND) OF TORTS § 343A(1) (1965)); *Tagle v. Jakob*, 97 N.Y.2d 165, 737 N.Y.S.2d 331, 763 N.E.2d 107, 109–110 (2001) ("We have long held that a landowner has no duty to warn of an open and obvious danger."); *Wrenn v. Hillcrest Convalescent Home, Inc.*, 270 N.C. 447, 154 S.E.2d 483, 484 (1967) (per curiam) ("However, defendant was under no duty to warn plaintiff, as an invitee, of an obvious condition or of a condition of which the plaintiff had equal or superior knowledge."); *Johanson v. Nash Finch Co.*, 216 N.W.2d 271, 276–278 (N.D. 1974) (adopting RESTATEMENT (SECOND) OF TORTS § 343A(1) (1965)); *Armstrong v. Best Buy Co.*, 99 Ohio St.3d 79, 788 N.E.2d 1088, 1091 (2003) ("Where a danger is open and obvious, a landowner owes no duty of care to individuals lawfully on the premises."); *Nicholson v. Tacker*, 512 P.2d 156, 158 (Okla.1973) ("It can be stated with equal force that the invitor has no duty to protect the invitee from dangers which are so apparent and readily observable that one would reasonably expect them to be discovered."); *Carrender v. Fitterer*, 503 Pa. 178, 469 A.2d 120, 123–124 (1983) (adopting RESTATEMENT (SECOND) OF TORTS § 343A(1) (1965); *Coln v. City of Savannah*, 966 S.W.2d 34, 41–44 (Tenn.1998) (same), *overruled on other grounds by Cross v. City of Memphis*, 20 S.W.3d 642 (Tenn.2000); *Hale v. Beckstead*, 116 P.3d 263, 265–270 (Utah 2005) (same); *Tazewell Supply Co. v. Turner*, 213 Va. 93, 189 S.E.2d 347, 349–350 (1972) (landowner owes no duty to warn "if the alleged dangerous condition was open and obvious to a person exercising reasonable care for his own safety"); *Monk v. Virgin Islands Water & Power Auth.*, 53 F.3d 1381, 1384–1388 (3d Cir.1995) (applying Virgin Islands law) (concluding RESTATEMENT (SECOND) OF TORTS § 343A(1) (1965) is consistent with Virgin Is-

possessor of land from the duty to protect an entrant; in every case both parties' fault must be determined and responsibility allocated between them. This is incorrect for at least three reasons. First, the Court went out of its way to reject this broad reading of *Parker* shortly after that case was decided. In *Dixon v. Van Waters and Rogers*, we denied the application for writ of error but wrote to correct the same misinterpretation of *Parker* that the Court now espouses:

> The term "no-duty," as used in *Parker*, referred to the oddity that had uniquely developed in Texas to confuse negligence law. It meant that a plaintiff had the burden to negate his own knowledge and his own appreciation of a danger. The rule that the plaintiff does not have the burden to obtain findings that disprove his own fault does not, however, mean that a plaintiff is excused from proving the defendant had a duty and breached it. A plaintiff does not have the burden to prove and obtain findings that he lacked knowledge and apprecia-

tion of a danger; he must, however, prove the defendant had a duty and breached it.[11]

Second, *Parker* did not purport to address the situation in which an entrant to property was not only fully aware of a risk of harm but fully capable of avoiding it. The Court cites this passage in *Parker*:

> A plaintiff's knowledge, whether it is derived from a warning or from the facts, even if the facts display the danger openly and obviously, is a matter that bears upon his own negligence; it should not affect the defendant's duty.[12]

That was true in the context in which it was written, but a plaintiff's awareness of a risk of harm, when coupled with a safe alternative for proceeding, is relevant in determining whether a reasonable person would ever incur the risk, and therefore whether the land possessor should be obliged to protect against it. And third, we have continued to analyze the duty owed by a possessor of land in different circumstances.[13] The obviousness of risk

---

lands' adoption of comparative fault); *Tincani v. Inland Empire Zoological Soc'y*, 124 Wash.2d 121, 875 P.2d 621, 630–631 (1994) (adopting RESTATEMENT (SECOND) OF TORTS § 343A(1) (1965)).

A few jurisdictions have held that the openness and obviousness of the condition is relevant to whether the landowner breached a duty to the invitee, but not to the threshold matter of whether the landowner owed a duty to warn of the condition. *See Markowitz v. Ariz. Parks Bd.*, 146 Ariz. 352, 706 P.2d 364, 367–368 (1985) (abrogated in part by statute); *Smith v. Baxter*, 796 N.E.2d 242, 243–245 (Ind.2003); *Harris v. Niehaus*, 857 S.W.2d 222, 225–226 (Mo.1993).

Some other jurisdictions have concluded that this rule is inconsistent with their comparative fault statutes, *see Koutoufaris v. Dick*, 604 A.2d 390, 395–398 (Del.1992); *Harrison v. Taylor*, 115 Idaho 588, 768 P.2d 1321, 1323–1329 (1989); *Tharp v. Bunge Corp.*, 641 So.2d 20, 23–25 (Miss.1994); *Woolston v. Wells*, 297 Or. 548, 687 P.2d 144, 147–150 (1984), or another state statute, *see Vigil v.*

*Franklin*, 103 P.3d 322, 323, 328–332 (Colo. 2004) (holding that COLO.REV STAT. ANN. § 13–21–115 preempted the "open and obvious danger" doctrine).

Lastly, some courts hold that whether a danger is open and obvious is merely one factor to be considered. *See, e.g., Pitre v. La. Tech Univ.*, 673 So.2d 585, 590–591 (La. 1996); *Klopp v. Wackenhut Corp.*, 113 N.M. 153, 824 P.2d 293, 297–298 (1992); *Rockweit by Donohue v. Senecal*, 197 Wis.2d 409, 541 N.W.2d 742, 748–749 (1995).

11. *Dixon v. Van Waters & Rogers*, 682 S.W.2d 533, 533–534 (Tex.1984) (per curiam noting writ ref'd, n.r.e.) (citation omitted).

12. *Parker*, 565 S.W.2d at 521.

13. *See, e.g., Trammell Crow Cent. Texas, Ltd. v. Gutierrez*, 267 S.W.3d 9, 17 (Tex.2008) ("[W]e conclude that [the landowner] could not have reasonably foreseen or prevented the crime and thus owed no duty in this case."); *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 213 (Tex.

is but one factor among others, repeatedly considered by this Court, in determining the nature of a land possessor's duty.

The Court protests that to hold that Del Lago owed Smith no duty is tantamount to reviving the long-rejected absolute defense of voluntary assumption of the risk, but this is not true. We rejected the defense because it placed undue weight on the subjective intent of the plaintiff in a negligence action governed by an objective reasonable-person test.[14] The rule stated in section 343A(1) of the *Restatement (Second)* is an objective rule. Under that rule, the issue is not, subjectively, whether the plaintiff voluntarily chose to risk harm, but objectively, whether a reasonable person could have avoided harm. Thus, the defense would have barred Parker's recovery, but section 343A(1) would not. An entrant is not denied recovery because he subjectively consented to assume the risk but because any reasonable person would have avoided it. Defining Del Lago's duty does not reintroduce the defense through a back door.

The Court says that a warning to Smith that a fight was imminent "hardly seems an adequate substitute for calling security or taking other reasonable steps during the course of the evening to prevent the fight."[15] Calling security *could* have helped—the jury found it would have—but it would not have guaranteed Smith's safety. The presence of officers might have brought reason to a bar full of men who had been drinking and cursing each other all night. Or if not, perhaps the officers could have arrested them all and carted them off before one slugged another. But whatever quieting influence security officers could have had, one absolutely sure way for Smith, who had drunk only one beer all night, to avoid injury was to walk out one of the exits before things escalated. If Smith had had no warning and no sure means of protecting himself, then I would agree that Del Lago was obliged to protect him. But he did.

If Smith's full appreciation of the risk and ample opportunity to avoid it hardly seemed an adequate substitute for calling security, the Court never says why. Nor does it attempt to explain how its notions about adequate substitutes provide a workable rule of law. The Court's job is not to offer its musings on the case but to state a clear rule of law, which it acknowledges it does not do: "We do not announce a general rule today",[16] only a "narrow and fact-specific holding."[17]

Legal duties should be determined categorically rather than ad hoc, should be based on sound policy, and should be as clear as possible. Section 343A(1) does all that. It applies an objective standard in

2008) ("We agree the jury alone can decide [negligence], but disagree that a jury can decide what legal duties landowners owe to independent contractors.").

14. *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 758 (Tex.1975) (rejecting voluntary assumption of the risk as an issue in negligence cases based on the legislative adoption of comparative negligence and the "cogent and compelling reasons" stated in *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 538–539 (Tex.1975) ("The heart of the matter is that the *volenti* doctrines represent an attempt to impose the analysis of subjective intent on a behavioral

tort rather than resolve liability or not on the basis of fault under traditional concepts of negligence. Put more simply, negligence is a measure of a party's conduct and the test is generally objective, whereas *volenti* is a subjective inquiry into a party's actual, conscious knowledge. The standards are different.") (Justice Steakley, joined on this point by two justices)).

15. *Ante* at 771 n. 32.

16. *Ante* at 770.

17. *Ante* at 774.

all circumstances. It recognizes that as a policy matter, a possessor of land is entitled to know, before injury has occurred, what the law requires and whether he has complied with it. It embodies the policy that obedience is better than the sacrifices made in the time and expense of a lawsuit.

. . .

Any reasonable person who saw a bar fight brewing and was concerned for his safety should be expected to avoid it if he could. Smith, Forsythe, and Morgan could easily have avoided the fight in the Grandstand Bar, and Morgan did. As he said, he "played it safe". Smith and Forsythe did not. Under the rule in section 343A(1), Del Lago's duty to Smith was fully discharged. I would therefore reverse and render judgment for Del Lago. Because the Court disagrees, I respectfully dissent.